■ In the Matter of CHARLOTTE'S FANCY RESTAURANT INC., Doing Business as WAVERLY & WAVERLY, Petitioner, v CITY OF NEW YORK DEPARTMENT OF CONSUMER AFFAIRS, Respondent.— In this CPLR article 78 proceeding transferred to this court by order, Supreme Court, New York County (Martin Evans, J.), entered September 16, 1985, the petition is granted and the determination of the City of New York Department of Consumer Affairs, dated January 11, 1985, which found petitioner guilty of operating a cabaret without a license therefor in violation of Administrative Code of the City of New York § B32-297.0, fined the petitioner $5,100, and issued a padlock order, annulled, on the law, without costs.

At issue here is whether by virtue of the nature of entertainment provided at its restaurant, petitioner was operating a "cabaret" as defined by Administrative Code § B32-296.0 (3) so as to burden it with the licensing requirements of Administrative Code chapter 32 article 38.

Petitioner was issued notice of violation, citation No. 4809,

by Inspector Arnold Frogel of the Department of Consumer Affairs (DCA) on July 14, 1984 for violation of "B32-197.0 Adm. Code *[sic]*" on the basis of the following violation: "Live entertainment before the patrons consisting of three vocalists accompanied by piano. I asked Manager Spain Logue for a cabaret license and he failed to produce it".

A hearing was held on this notice of violation before DCA Hearing Officer Karen Miller, Esq. The testimony of the witnesses at that hearing is thoroughly summarized in the dissenting opinion of Justice Kassal. The question in this proceeding is whether this evidence is sufficient to establish that petitioner was operating a cabaret in violation of the statute.

This statute expressly defines a "cabaret" as follows: "Any room, place or space in the city in which any musical entertainment, singing, dancing or other form of amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, except eating or drinking places, which provide incidental musical entertainment, without dancing, either by mechanical devices, or by not more than three persons playing piano, organ, accordian or guitar or any stringed instrument or by not more than one singer accompanied by himself or a person playing piano, organ, accordian, guitar or any stringed instrument". (Administrative Code § B32-296.0 [3].)

The dissent has seized on the word "incidental" in that portion of the statute which creates an exception for "incidental musical entertainment". By so doing it overlooks the meaning of the ordinance as a whole. "[I]ncidental musical entertainment" is defined in the statute as "not more than three persons playing piano, organ, accordian or guitar or any stringed instrument or * * * not more than one singer accompanied by himself or a person playing piano, organ, accordian, guitar or any stringed instrument". Words in a statute may receive technical significance from "long habitual construction, or by legislative definition" (McKinney's Cons Laws of NY, Book 1, Statutes § 232) and by including this precise explication of the "incidental music" exception, the statute defines the term. *(See, e.g., People v Walter,* 106 Misc 2d 359, 360.) "A statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent" (McKinney's Cons Laws of NY, Book 1, Statutes § 97). "[W]ords, phrases, and sentences of a statutory section should be interpreted with reference to the scheme of the entire section. Thus the

meaning of an undefined word depends on the meaning of the whole act." (§ 97.) Thus, in this case pursuant to the statute, an establishment which permits musical entertainment by not more than three persons playing the specified instruments, or by not more than one singer accompanied by one specified instrumentalist, is not a cabaret as defined by the very statute itself.

Insofar as this statute imposes a licensing requirement on establishments which present musical entertainment, we note that such entertainment is protected by the 1st Amendment guarantees of freedom of expression. *(See, e.g., Schad v Mount Ephraim,* 452 US 61, 65-66; *Joseph Burstyn, Inc. v Wilson,* 343 US 495; *see also, Club Winks v City of New York,* 99 Misc 2d 787.) An ordinance which regulates constitutionally protected expression must be drawn with precision and narrowly construed. *(See, e.g., Interstate Circuit v Dallas,* 390 US 676.) We, therefore, must reject the more expansive construction of the "incidental music exception" here at issue.

We are also guided by the principle that a statute must give a citizen clear notice of the conduct prohibited. Here that notice is given in the incidental music exception of Administrative Code § B32-296.0 (3) by enumerating the number and types of instruments permissible. To relegate the operator of an unlicensed establishment to the uncertainties of undefined ad hoc administrative determinations beyond the statutory definition is to unfairly subject the owner to possible penalties without appropriate notice.

Turning to the facts of the instant case, it is clear that on the whole the entertainment regularly presented by petitioner consisted of one pianist and a vocalist. Whether accepting Inspector Frogel's testimony that the additional vocalist was a performer who sang together with the others, or the testimony of the manager of the premises that she was a member of the audience who joined in for an impromptu rendition, it is clear that this additional singer was but one small portion of the evening's presentation, which was otherwise permissible at this unlicensed premises. The restaurant's manager, Spain Logue, testified that the pianist usually accompanies himself, adding that, "There are occasions when usually a customer or someone comes up to the pianist and requests to sing a song. We provide that accommodation for a customer on spontaneous occasions, and they will sing possibly a song of their choosing, if he knows it".

Such spontaneous audience participation, or the temporary abandonment by the pianist of the accompanist's role to sing

an ensemble, cannot transform what is an otherwise permissible presentation into activity which violates the cabaret law. In *People v Byrne* (84 Misc 2d 211), the defendant operated an establishment not licensed as a cabaret which provided entertainment by a musical ensemble of three persons playing a banjo, a guitar, and a melodica. The issuance of the summons was prompted by the fact that one of these instrumentalists put aside the melodica and began to sing, with the audience joining in the singing. There the court held that neither the temporary and sporadic vocalizing by an instrumentalist nor the spontaneous audience participation were appropriate grounds to require licensing where it would not otherwise be required. A similar result is indicated here.

Moreover, the greater part of the testimony at this administrative hearing was irrelevant to the offense charged—i.e., the citation of presenting entertainment on July 14, 1984 in violation of the cabaret licensing law. None of the four neighbor-witnesses was present on the night of the alleged violation but instead testified as to incidents of uncharged alleged violations. Of these four witnesses only one was ever present on the premises and the others only related what they heard from outside. The introduction of such testimony was highly prejudicial to petitioner. The claim in the dissent that this premises is in a "residential" area, or stayed open very late at night, also is irrelevant to the charge of operating an unlicensed cabaret offering nonincidental music, and is belied by the fact that the establishment is situated in the heart of Greenwich Village. Advertisements and reviews of other performances at the restaurant are also irrelevant to the charge here at issue. There is no statutory, or other, proscription upon advertising by a noncabaret restaurant presenting permissible entertainment. Indeed, it is observed that numerous unlicensed establishments regularly advertise shows of three or fewer musical entertainers in local newspapers and magazines, and that other unlicensed nightclubs are permitted by DCA to present well-advertised musical or vocal duos or trios even after being fined *(see, e.g., City Forces Clubs to Restrict Jazz, New York Times,* Apr. 10, 1986, at C13).

As the court stated in *People v Byrne (supra,* p 213), in declining to read the ordinance strictly so as to deprive the restaurant from the stated exception from the licensing provision, we are "[g]uided by the concept that licensing requirements penal in nature should be strictly construed against the party seeking their enforcement and in favor of the accused [citations omitted], and that vocalizing is a form of expression

which should remain as unencumbered as possible absent specific legislative directions".

Were we not annulling the determination of the DCA on the underlying merits, we would, as both dissenters note, annul the penalty of a $5,100 find as arbitrary and unsupported by the evidence. DCA imposed a penalty of a fine of $50 per day measured from the date of the issuance of the citation until the date the hearing commenced. There is no allegation, let alone proof, that petitioner was operating a "cabaret" since the date of the alleged violation. Since Administrative Code § 773-4.1 (b) (1) authorizes a fine of up to $100 per day "for each and every day" there is a violation, in the absence of any evidence of a violation between the date of the citation and the date of the hearing, there was no rational basis to impose a fine for that period. Concur—Carro, Asch and Ellerin, JJ. Kassal, J., dissents and Kupferman, J. P., concurs in part in Justice Kassal's dissent in separate memoranda as follows:

Kassal, J. (dissenting).

This is a CPLR article 78 proceeding, transferred to this court to review a determination of the Department of Consumer Affairs, which, after a hearing, found that petitioner had been operating its restaurant, known as Waverly & Waverly, located at 147-153 Waverly Place, New York City, as an unlicensed cabaret. As a result, respondent imposed a fine of $50 per day from the date of the citation (July 14, 1984) to the commencement of the administrative hearing (October 24, 1984), a total of $5,100, ordered petitioner to cease the unlicensed activity and issued a "padlock" order, pursuant to Administrative Code of the City of New York § 773-4.1 (b) (3), directing that the premises be sealed should petitioner fail to desist from the unlicensed activity within 10 days of the order.

While I find the monetary fine imposed excessive in relation to the nature of the charge, especially in the absence of any affirmative proof to support the severe penalty, I disagree with the majority's conclusion that the evidence at the hearing was insufficient to sustain the administrative determination. To the contrary, there was a sharp conflict in the proof and, in my view, there is substantial evidence in the record to support the determination, especially bearing in mind the limited nature of judicial review available in an article 78 proceeding.

Waverly & Waverly is a second-floor restaurant which regularly provides musical entertainment to patrons. The restaurant consists of a large room with a piano on a raised stage area, which is highlighted by bright lights. Regular entertainment consists of a piano player singing or accompanying

singers from that raised platform. The prime issue in this proceeding is whether this was "incidental musical entertainment" or whether Waverly operated an unlicensed cabaret, in violation of Administrative Code § B32-297.0. Administrative Code § B32-296.0 (3) defines a cabaret as follows: "Any room, place or space in the city in which any musical entertainment, singing, dancing or other form of music is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink, *except eating or drinking places, which provide incidental musical entertainment,* without dancing, either by mechanical devices, or by not more than three persons playing piano, organ, accordian or guitar or any string instrument or *by not more than one singer accompanied by himself or a person playing piano,* organ, accordian, guitar or any stringed instrument and except coffee houses as defined in paragraph one of section B32-310.0 of this code." (Emphasis added.)

On July 14, 1984, Department of Consumer Affairs Inspector Arnold Frogel, accompanied by two other inspectors, visited Waverly & Waverly at about midnight. They ordered dinner and remained for about two hours. They observed a piano player, Jerry Scott, accompanied by a singer, who performed for about one-half hour, during which time customers in the restaurant gave their undivided attention to the performers. The performances were amplified electronically and after each song, there was a pause and applause from the audience. After a 25-minute break, the pianist returned to the stage and was joined by the other performer and a woman from the audience. According to Frogel, all three sang for another one-half hour, at the conclusion of which Frogel requested the manager, Spain Logue, to produce a cabaret license. When none was produced, a citation was issued for operating an unlicensed cabaret, namely, permitting live entertainment consisting of three vocalists, accompanied by a piano. (Administrative Code § B32-296.0 [3].)

Both Logue and Scott disagreed with Frogel's account. Logue testified that no other performer accompanied the piano player on the night in question. He stated that Scott was approached by a woman from the audience, who requested to sing a song. Logue had known her from prior occasions and it was she who beckoned Logue to join them on the stage, which he did, unaware that, by doing so, he had committed a violation. According to Scott, this was the only occasion when a patron joined the pianist in a song, although, in the past, he did play the piano without singing, to accompany customers

who spontaneously came to the stage to sing. One of the owners, James Bozart, also testified that the restaurant rarely hired performers other than the piano player. However, occasionally, for Sunday brunch, a singer might be hired but, when the singer was performing, the piano player would accompany the vocalist on the piano and would not sing.

Thus, the administrative transcript reflects a clear conflict in the proof as to the nature of the entertainment on the night in question and whether there was more than one vocalist accompanied by a person playing the piano. The credibility of these witnesses and the resolution of the factual issues were matters for administrative determination, beyond the limited scope of judicial review in an article 78 proceeding.

There was also testimony from neighborhood residents as to the nature of Waverly's business in relation to whether the restaurant actually provided "incidental musical entertainment", which, according to Frogel, meant "background music, which is generally soft and in the background * * * [and] would not encroach upon the patron's conversations". He had testified that customers did not engage in conversation and the room was quiet, with patrons "mostly listening" during the performance.

One of the witnesses was Cheryl Fein, who lives in a second-floor apartment, directly across from Waverly & Waverly. From her window, she has a direct view of the stage and the piano and has observed and heard shows introduced and amplified musical performances. The unobstructed nature of her view was highlighted by her testimony that, at times, the bartender has waved to her from across the street, while she was in her apartment. She testified that she heard, "on a regular and consistent basis, amplified talking into a microphone, of [sic] introduction of musical material, banter relating to the audience and the music, singing, piano playing, applause, group singing." On other occasions, she heard and observed two singers performing together, accompanied by a piano, as well as group singing and audience participation.

She also produced a newspaper advertisement, introduced as an exhibit, reviewing one of Waverly's "[s]pecial guest entertainers for the music brunch", George Sardi, who, according to the article, appeared on stage wearing "a bright red wig, red sequin jacket, two inch eyelashes, ten pounds of ornaments and walks in barelegged, carrying a lit Fourth of July sparkler." She testified that, in the past, she called Waverly and obtained specific times for Sunday show performances. At the

hearing, Waverly's counsel stipulated that there were "shows", but claimed that they fell within the definition of the Code's exception for "incidental musical entertainment."

Ms. Fein's account as to the nature of the entertainment was confirmed by others, including Jeffrey Haddow, who also lives across the street, in a first-floor apartment. Although he could not see the performers, he could and did observe the spectators and saw their hands moving in applause at the end of any musical number. He testified to hearing performances with the piano and one singer or, at times, the piano and a lead singer and two backup singers. On Sunday afternoons, he heard shows consisting of three singers accompanied by a piano. At times, the musical entertainment awakened him as late as 4:30 A.M. Luther Travis, another neighbor, testified that he went to Waverly & Waverly in June or July of 1984, and observed the piano player play three or four songs, sing one and announce a female singer, who sang a series of seven or eight songs, followed by an encore, which was accompanied by the piano player, who also sang. Fay Robison, also a neighborhood resident, had walked past the restaurant in October 1984 and noticed a placard in the window, which she photographed. The photograph of the sign was introduced as an exhibit at the hearing. It described Waverly's show times and differentiated between cocktail music from 5:30 to 9:00 P.M., entertainment from 9:30 P.M. to 4:00 A.M. and listed the names of specific performers for the Sunday brunch from 12:30 to 5:30 P.M., suggesting that reservations be made.

Following the hearing, respondent credited the account offered by the inspector and the neighbors as to the nature of the entertainment, concluding that Waverly operated an unlicensed cabaret, in that it regularly offered entertainment of more than one singer accompanied by a piano. The hearing officer found that the musical entertainment was not "incidental", within the terms of the Administrative Code and the dictionary definition as "subordinate, nonessential, or attendant in position or significance: as (a): * * * occurring as a minor concomitant" (Webster's Third New International Dictionary [1981]). In concluding that there had been a violation in operating an unlicensed cabaret, respondent determined that: "the type of entertainment which it provided was clearly not that referred to commonly as cocktail or background music or in the statute as incidental musical entertainment. The plain meaning of incidental musical entertainment precludes a costumed entertainer making a spectacular entrance at set show times to perform upon a stage."

On review of the record, I find not only substantial evidence but the overwhelming weight of the evidence supports the administrative determination that petitioner had been operating an unlicensed cabaret, in violation of Administrative Code § B32-297.0. In concluding otherwise, my colleagues have transcended the limited scope of review afforded in article 78 proceedings, contrary to well-settled principles (see, 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180-182; Matter of Pell v Board of Educ., 34 NY2d 222, 230-231). These and other cases have uniformly held that the courts do not have the right or power to review the facts generally as to the weight of the evidence, but only to determine whether the administrative determination is supported by "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact [citing case]" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, supra, at p 180). In that case, (pp 181-182), the Court of Appeals reiterated the long-standing rule with respect to the limited review in terms of substantial evidence: "In final analysis, substantial evidence consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably—probatively and logically [citing cases]. Put a bit differently, 'the reviewing court should review the whole record to determine whether there is a rational basis in it for the findings of fact supporting the agency's decision' (McCormick[,] Evidence [2d ed], § 352, p 847; see Matter of Pell v Board of Educ., 34 NY2d 222, 231; Siegel, New York Practice [1978], § 560, p 783)."

In my view, the majority's fact-finding analysis is inconsistent with these principles. The prime issue is whether there is a rational basis in the record to support the administrative findings, not whether this court would have come to a different result if this were a case being tried in the first instance in a court of law. The ultimate question is whether, on the entire record, the administrative determination is supported by substantial evidence, a test which Judge Learned Hand described, over 50 years ago, as follows: "in the end the finding is supported by the kind of evidence on which responsible persons are accustomed to rely in serious affairs." (National Labor Relations Bd. v Remington Rand, 94 F2d 862, 873, cert denied 304 US 576.)

It has always been recognized that an administrative agency's assessment as to the credibility of witnesses and infer-

ences drawn from the evidence is conclusive, if supported by substantial evidence in the record *(see, Matter of Di Maria v Ross,* 52 NY2d 771, 772; *Matter of Fisher [Levine],* 36 NY2d 146, 149-150; *Matter of Stork Rest. v Boland,* 282 NY 256, 267). The observation by Chief Judge Lehman in *Matter of Stork Rest. v Boland (supra,* p 267) is most instructive: "Where there is conflict in the testimony produced before the Board, where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the Board. The courts may not weigh the evidence or reject the choice made by the Board where the evidence is conflicting and room for choice exists."

As applied here, and noted, there was a conflict in the proof as to the nature and extent of the entertainment on the night the citation was issued. Whether the accounts offered by Inspector Frogel and the neighbor-witnesses were to be accepted, in place of those by Messrs. Logue, Scott and Bozart that what occurred on July 14, 1984 was only an isolated and rather unusual instance, was a matter to be resolved by the administrative body, not this court in the exercise of its judicial review. As to the failure of the two other inspectors who accompanied Frogel to testify, that, again, was a matter for respondent, in terms of its evaluating credibility and weight of the evidence. This is especially so since Frogel's testimony, and that of the other witnesses, was not shown to be either incredible or impossible as a matter of law *(see, Matter of Sowa v Looney,* 23 NY2d 329, 336).

In contrast to petitioner's claim that what occurred was unusual and out of the ordinary, the testimony of the neighbors as to the nature and frequency of the entertainment, the newspaper review of petitioner's floor show and the window advertisement relating to the different types of entertainment are all highly significant on the issue of the "incidental" nature of the musical entertainment. Under the circumstances, I fail to perceive the basis for the majority's conclusion that musical and singing reviews by more than one singer, accompanied by a piano, extending into the early hours of the morning, or a performance by an elaborately costumed entertainer, making a spectacular entrance at certain designated show times and performing upon a stage, is "incidental musical entertainment" within the meaning of the Administrative Code. This hardly comports with the soft

background music and entertainment which one would reasonably expect to accompany restaurant dining. Bearing in mind the residential character of the neighborhood and the undisputed fact that the musical entertainment was offered at specific show times and well into the early morning hours, with patrons restricted during the show from engaging in usual dinner conversation and with their attention focused upon the featured performers, I find a rational basis for the administrative determination that petitioner's operation required a cabaret license. Plainly, this was not "incidental musical entertainment", within the contemplation of the Code.

The record as a whole supports the administrative finding of a violation of Administrative Code § B32-297.0, so as to authorize imposition of an appropriate fine and a padlock order under section 773-4.1 (b) (1), (3). However, I do not find any support in the record for the severe monetary penalty which was imposed, amounting to $50 per day from the date of the citation to the date the hearing commenced.

While the Code does authorize a fine of up to $100 per day during the time a violation is in effect, there should be some rational and factual support as to the extent of the fine, sufficient to conclude that the penalty administratively imposed was neither arbitrary, capricious nor excessive. The fact that the fine was less than the maximum does not, in and of itself, render it either rational or proper in the circumstances. I recognize that the imposition of appropriate penalties, including fines, is necessary to give teeth to the Administrative Code direction with respect to a cabaret license. Nevertheless, under the circumstances, including petitioner's claim, which is not irrational, that it was unaware that its activities required a cabaret license, the extent of the fine may have been disproportionate to the degree of misconduct involved so as to be shocking to one's sense of fairness *(see, Matter of Pell v Board of Educ., supra,* at pp 233, 234). As far as appears, no proof was adduced to sustain the amount of the fine nor do the briefs on this appeal dispel the notion that the degree of the penalty, in terms of amount, was an arbitrary determination.

Accordingly, in my view, the determination should be annulled only to the extent of setting aside and vacating the fine and remanding the matter to respondent for further proceedings on that issue *(cf. Burke's Auto Body v Ameruso,* 113 AD2d 198, 200-201). In all other respects, respondent's determination, dated January 11, 1985, should be confirmed.

Kupferman, J. P. (concurring in the dissent in part).

I find that, as a matter of administrative law, I must concur in the dissent of my colleague, Kassal, J., and accept the administrative determination that a cabaret license is required. I also concur in the determination, from which there is no dissent, that the monetary penalty is both too severe and without foundation in the Administrative Code of the City of New York.

Administrative Code § 773-4.1 (b) (1) provides as follows: "1. to impose fines upon any person in violation of subdivision a of this section of one hundred dollars per violation per day for each and every day during which such person violates such subdivision."

As can be seen, the fine provided for is up to $100 per day *during the time the violation was in effect.* There is no proof at all that there was a violation from the date of the citation to the date the hearing commenced, which was the basis for the penalty imposed. The evidence would show that on one night an inspector from the Department of Consumer Affairs found a violation. Other than that, two neighbors testified that, on occasion, there were violations. There should be a showing of specific times. Accordingly, the fine should be annulled and the matter remanded for further proceedings.