*129 OPINION OF THE COURT
Nicholas Colabella, J.
In a proceeding pursuant to CPLR article 78, petitioner seeks a judgment annulling a determination by respondent revoking a music license and declaring sections 10-15 and 10-16 of the Village Code of Spring Valley invalid.
Petitioner is the owner and operator of the Camelot Club, a bar, that had been licensed by the village under section 10-15 of the Village Code of Spring Valley to offer live or mechanically reproduced music. Except for coin-operated juke boxes, section 10-15 prohibits the owner or operator of a "restaurant, coffee house, tavern, bar or any public place of amusement” from offering "live or mechanically reproduced music without first obtaining a permit” from the Village Board.
A permit may be granted upon the following criteria:
(1) The applicant is of good moral character;
(2) The music emanating from the establishment of the applicant will not be objectionable to adjoining users of property or village residents;
(3) Suitable parking is provided for patrons of the establishment so as not to cause congestion in the streets of the village in and about the establishment;
(4) The police chief has no reasonable objection to the issuance of the license to the applicant;
(5) The issuance of the license shall not adversely affect the health, welfare or morals of the residents of the village.
Section 10-16 (b) provides that a permit may be revoked upon a showing that its "continuation is injurious to the health, welfare or morals of the residents of the village.”
Petitioner argues sections 10-15 and 10-16 are unconstitutionally vague and overbroad. Respondent contends that petitioner has failed to overcome the presumption of constitutionality applicable to statutes, and that the wording of the ordinances is clear and sets reasonable criteria which can be commonly understood.
Analysis of the parties’ constitutional claims begins with a determination of the appropriate standard of review. "[T]he standard of review is determined by the nature of the right assertedly threatened or violated rather than the power being exercised or the specific limitations imposed” (Schad v Mount Ephraim, 452 US 61, 68; Thomas v Collins, 323 US 516, 529-530). While the power of local governments to adopt ordi *130 nances to advance the public health, safety and welfare is broad and well established (see, Municipal Home Rule Law § 10 [1] [ii] [a] [12]; Village Law § 4-412 [1]; see generally, Matter of Town of Islip v Caviglia, 73 NY2d 544, 550; People v New York Trap Rock Corp., 57 NY2d 371, 377), such powers must be exercised within constitutional limits (Schad v Mount Ephraim, supra, at 68; Moore v East Cleveland, 431 US 494, 514 [Stevens, J., concurring in judgment]; Jancyn Mfg. Corp. v County of Suffolk, 71 NY2d 91, 96). Legislative acts normally enjoy a strong presumption of constitutionality and will be upheld if there is a reasonable relationship between the end sought to be achieved and the means adopted to achieve it (Matter of Town of Islip v Caviglia, supra, at 550-551), but that presumption "carries little, if any, weight where the * * * regulation trenches on rights of expression protected under the First Amendment” (Schad v Mount Ephraim, supra, at 77 [Blackmun, J., concurring], and at 79-80 [Stevens, J., concurring in judgment]).
Regulations enacted for the purpose of restraining expression on the basis of content presumptively violate the First Amendment (Renton v Playtime Theatres, 475 US 41, 46-47; Bantam Books v Sullivan, 372 US 58, 70; People ex reí. Arcara v Cloud Books, 65 NY2d 324, 332, revd on other grounds 478 US 697) and are subject to strict scrutiny (Police Dept. of Chicago v Mosley, 408 US 92, 95, 98-99; Matter of Town of Islip v Caviglia, supra, at 556). A content-based regulation of protected expression may be sustained "only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest” (Consolidated Edison Co. v Public Serv. Commn., 447 US 530, 540).
On the other hand, "content-neutral restrictions, those justified without reference to the content of the regulated speech and relating only to the time, place, and manner of expression, are valid if the governmental interest to be achieved outweighs the resulting interference with free expression” (Matter of Town of Islip v Caviglia, supra, at 556-557). "Content-neutral” time, place and manner restrictions are acceptable provided they serve a substantial governmental interest, do not unreasonably limit alternative channels of communication, and are narrowly tailored to serve the governmental objective (Renton v Playtime Theatres, supra; United States v O’Brien, 391 US 367; City of Watseka v Illinois Pub. Action Council, 796 F2d 1547, affd 479 US 1048; see, e.g., Young v American Mini Theatres, 427 US 50 [regulation of location of *131 adult motion picture theatres]; Kovacs v Cooper, 336 US 77 [limitation on use of sound trucks]; Cox v Louisiana, 379 US 559 [ban on demonstrations near courthouse with intent to obstruct justice]; Grayned v City of Rockford, 408 US 104 [ban on willful making of noise near a school which disturbs the good order of the school session]).
"Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee” (Schad v Mount Ephraim, supra, at 65). By extension, a business offering musical entertainment, such as petitioner’s club, implicates the First Amendment (see generally, Doran v Salem Inn, 422 US 922; Interstate Circuit v Dallas, 390 US 676; Joseph Burstyn, Inc. v Wilson, 343 US 495; see, e.g., Matter of Charlotte’s Fancy Rest. v City of New York Dept. of Consumer Affairs, 121 AD2d 969, 971, revd on other grounds 69 NY2d 865 [cabaret]; Chiasson v New York City Dept. of Consumer Affairs, 138 Misc 2d 394 [cabaret]; People v Walter, 106 Misc 2d 359, 361 [cabaret]; Club Winks v City of New York, 99 Misc 2d 787, 791 [cabaret]). Preservation of freedom of expression requires protection of the means of disseminating expression (Lovell v City of Griffin, 303 US 444; Genusa v City of Peoria, 619 F2d 1203, 1218).
"The crucial factor in determining whether State action affects freedom of expression is the impact of the action on the protected activity and not the nature of the activity which prompted the government to act. The test, in traditional terms, is not who is aimed at but who is hit” (People ex rel. Arcara v Cloud Books, 68 NY2d, at 558, supra).
Prior restraints "on First Amendment rights may be present not only where a statute directly prohibits expression but also where the impact of the statute curtails the exercise of these rights” (People ex rel. Arcara v Cloud Books, 65 NY2d 324, 335, revd on other grounds 478 US 697, supra). Licensing provisions act as prior restraints on expression "if they permit authorities to deny the use of a forum for protected expression in advance of actual expression” (Wall Distribs. v City of Newport News, 782 F2d 1165, 1171; see also, Genusa v City of Peoria, 475 F Supp 1199, 1206). The subject regulation is unquestionably a prior restraint.
In assessing the constitutionality of this restraint, the threshold inquiry then is to its purpose — i.e., whether the *132 regulation is aimed at suppressing expression or whether suppression is merely the incidental effect of regulating non-First Amendment interests. In making that assessment, the court must consider the motive of the municipality (Matter of Town of Islip v Caviglia, supra, at 552, n 2). The legislative intent in enacting the ordinances here is unstated. Consequently, the court is unable to conclude from the record that the predominant purpose of the ordinance is other than the suppression of musical expression that the village may find undesirable.
Nor has respondent alleged any substantial governmental interest that licensing is designed to serve. Even if some objectives might be inferrable from the criteria in the ordinances, the government’s concerns as to noise, traffic, safety, health, welfare and morality are so generally stated as to amount to nothing more than a recitation of abstract interests associated with a municipality’s police power, and fall far short of the specific basis needed to justify restricting expression.
Respondent has also failed to demonstrate that the regulation is narrowly tailored to achieve such objectives. As discussed below, there has been no showing either that there is a significant relationship between the regulation of expression and the governmental interest, or that less restrictive alternatives are inadequate to protect the governmental interest (City of Watseka v Illinois Pub. Action Council, 796 F2d 1547, 1554, supra; Ellwest Stereo Theater v Boner, 718 F Supp 1553, 1568; Genusa v City of Peoria, 475 F Supp, at 1205, supra; see also, People ex rel. Arcara v Cloud Books, 68 NY2d, at 559, supra, and 65 NY2d, at 335-336, supra, revd on other grounds 478 US 697, supra).
"[Licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places” have been consistently condemned (Kunz v New York, 340 US 290, 294). The Supreme Court in Grayned v City of Rockford (supra, at 108-109) stated that "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters * * * for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application * * * [W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment free- *133 dams,’ it 'operates to inhibit the exercise of [those] freedoms.’ ”
The criteria in the subject regulation are so vague as to invite arbitrary application. Criterion 1, for example, which requires an applicant to be of "good moral character”, is identical to that considered in Genusa (supra). The court there declared "the unfettered discretion of the city manager to deny a license on the basis of lack of 'good character and reputation,’ which is undefined in the ordinance, is clearly an unconstitutional prior restraint” (475 F Supp, at 1207, supra).1 The same result was reached in Bayside Enters. v Carson (450 F Supp 696, 707), where the court observed: "[T]he effect of the Code’s 'good moral character’ criterion is to allow the Sheriff to deny a license to whomever he pleases and to legitimatize that action through reference to a criterion which is so imprecise as to be virtually unreviewable.”2
Criterion 2, which makes qualification dependent on a lack of objection by adjoining users and village residents, employs an equally subjective standard which, in effect, grants an applicant’s neighbors an unqualified right of censorship without regard for the rationality of the basis for objection. Such subjective standards have been variously condemned as making enforcement subject to the " 'malice or animosity of a cantankerous neighbor’ ” or the " 'boiling point of a particular person’ ” (People v New York Trap Rock Corp., supra, at 380; see also, Miller v Valley Forge Vil., 43 NY2d 626, 632).
Criterion 3, which requires "suitable parking so as to avoid traffic Congestion”, fails to define what is "suitable”. To the extent it would allow a different standard amongst businesses offering music and those which do not, the need for such a distinction is unproven. The maximum capacity of the affected establishments is already fixed by building and fire codes, and there is no basis in the record to infer that, within those limits, patrons at establishments offering music would be more likely to generate traffic than those attending establishments where there is no music (see, Chiasson v New York City Dept. of Consumer Affairs, supra, at 397; cf. Schad v Mount Ephraim, supra, 452 US, at 73-74, n 16).
By a parity of reasoning, it is unclear generally what problems are posed by live and mechanically reproduced music, which is regulated, that a juke box, which is exempted, would not pose. In Walter (supra, at 362), the court rejected a similar distinction between live and mechanically reproduced *134 music, commenting: "In view of modern technology which has enabled one phonograph record with a complex speaker system to sound like an orchestra, the distinction drawn by the legislature has become, in effect, obsolete.”
The distinction drawn between methods of musical production is also analogous to the distinction between live nude dancing and nude dancing in films rejected in Schad (supra). The court there explained: "Even less apparent is what unique problems would be posed by exhibiting live nude dancing in connection with the sale of adult books and films, particularly since the bookstore is licensed to exhibit nude dancing on films. It may be that some forms of live entertainment would create problems that are not associated with the commercial uses presently permitted in Mount Ephraim. Yet this ordinance is not narrowly drawn to respond to what might be the distinctive problems arising from certain types of live entertainment, and it is not clear that a more selective approach would fail to address those unique problems if any there are. The Borough has not established that its interests could not be met by restrictions that are less intrusive on protected forms of expression.” (Schad v Mount Ephraim, supra, 452 US, at 74.)
Criterion 4, which requires that there be no "reasonable objection” by the police chief, attempts to provide a more objective standard than, for example, criterion 2 by using the word "reasonable”, but is rendered meaningless by the absence of any definition of a "reasonable objection.”
Criterion 5, which requires that there be no adverse effect on the health, welfare or morals of the village’s residents, is akin to the standard in Shuttlesworth v Birmingham (394 US 147). There, a local ordinance prohibited a parade, procession or other public demonstration without a permit from the City Commission which was empowered to refuse a permit when, " 'in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience’ ” required (supra, at 153-154). The Supreme Court held the ordinance "as it was written, conferred upon the City Commission virtually unbridled and absolute power to prohibit any 'parade,’ 'procession,’ or 'demonstration’ on the city’s streets or public ways. For in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.’ This ordinance as it was written, therefore, fell squarely within the ambit of the many decisions *135 of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.” (Supra, at 150-151; see also, Staub v City of Baxley, 355 US 313, 322.)
By the same reasoning, section 10-16, which permits a music license to be terminated upon "a showing that the continuation of such permit is injurious to the health, welfare or morals of the residents of the village”, is equally vague, and has a chilling effect on First Amendment expression.
Lastly, the court is unable to save the subject ordinances through judicial construction by construing them in accordance with constitutional requirements (as was done in Shuttlesworth v Birmingham, supra, at 154-155). Given the breadth of the ordinances and the lack of clear objectives, any attempt by the court would be tantamount to wholesale revision of the Legislature’s enactment, rather than prudent judicial construction (People v Dietze, 75 NY2d 47, 52; see, e.g., People v J. W. Prods., 98 Misc 2d 67, 75-76). Accordingly, sections 10-15 and 10-16 of the Village Code of Spring Valley are declared unconstitutional.
END NOTES
1. Some more specific standards of character, which required denial of a license to conduct a protected First Amendment activity based on a prior criminal conviction, have been held invalid unless shown necessary to avert a clear and present danger (Club Winks v City of New York, supra, 99 Misc 2d, at 792; see, e.g., People v Taub, 37 NY2d 530, 534; Matter of Colonie Theater v City of Schenectady, 89 AD2d 631, 632; People v J. W. Prods., 98 Misc 2d 67, 74; see also, Ellwest Stereo Theater v Boner, supra, 718 F Supp, at 1568; Genusa v City of Peoria, supra, 619 F2d, at 1219, n 40, and 475 F Supp, at 1207-1208; Natco Theatres v Ratner, 463 F Supp 1124, 1128-1131). The rationale of these cases is that unprotected "conduct should not serve as the basis for the prohibition of future conduct that may well fall within the purview of the First Amendment” (Matter of Colonie Theater v City of Schenectady, supra, at 632; see also, People ex rel. Arcara v Cloud Books, supra, 65 NY2d, at 333, revd on other grounds 478 US 697).
2. But see, Postscript Enters. v City of Bridgeton (699 F Supp 1393) which upheld a licensing scheme for a movie arcade without standards on the basis that a hearing was provided and the City Council had discretion to grant a license. Postscript appears contrary to the cited precedent, but is of dubious value. On appeal, the City Council conceded it had no right to deny a permit (905 F2d 223, 227-228 [8th Cir]).