**ELLWEST STEREO THEATER, INC., et al.**

v.

**Bill BONER, Mayor, et al.**

No. 3–87–0114.

United States District Court, M.D. Tennessee, Nashville Division.

July 14, 1989.

Larry Woods, Irwin Venick, Michele D. Collins, Woods & Woods, Nashville, Tenn., Lee J. Klein, Durand, Mich., for plaintiffs.

William F. Howard, John L. Kennedy, Metropolitan Attys., Nashville, Tenn., for defendants.

## MEMORANDUM

HIGGINS, District Judge.

On February 10, 1987, the plaintiffs, Ellwest Stereo Theater, Inc., First Amendment Books and Rodney Skinner, filed this action against Richard Fulton, then Mayor of Metropolitan Nashville, in his official capacity, and the Metropolitan Government of Nashville and Davidson County, Tennessee, seeking a declaratory judgment determining the constitutionality of a Metropolitan Nashville ordinance (Bill No. 086–1549) governing the licensing of adult-oriented establishments. The plaintiffs also seek a preliminary and permanent injunction enjoining the defendants from enforcing the ordinance on the ground that the ordinance is unconstitutional. Jurisdiction is invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343(3), § 2201 and § 2202 and Rule 57, Fed.R.Civ.P. The defendants filed an answer on March 9, 1987.

On October 14, 1987, the plaintiffs filed a motion to substitute Bill Boner, Mayor of Metropolitan Nashville, in his official capacity, for Richard Fulton. The motion was granted by an order entered November 5, 1987. This action was heard without the intervention of a jury on August 15, 16 and 17, 1988.

## I.

The plaintiff, Ellwest, is a Tennessee corporation. At all times relevant to these proceedings, it has operated a retail business establishment located at 418 Broadway, in Nashville. Located on the business premises, in booths approximately three feet by four feet, are coin-operated devices which, upon the insertion of a coin or token, permit a patron to view live adult entertainment or adult motion picture films. The booths in which live entertainment is presented contain a plexiglass shield which separates the performer and the patron.

The plaintiff, First Amendment Books, is a foreign corporation, authorized to conduct business in the State of Tennessee. At all times relevant to these proceedings, First Amendment Books has operated a retail business establishment at the corner of Fourth Avenue and Broadway in Nashville. First Amendment Books sells and displays for sale various magazines, books, novels, videocassettes, films and novelty items which are of a sexually-explicit nature. Also located on its business premises are booths of a same or similar size as those at Ellwest's business premises in which adult motion picture films are presented. The plaintiff, Rodney Skinner, was an employee of First Amendment Books who worked as a clerk in the retail portion of the business.

On or about February 3, 1987, the Metropolitan Government adopted and enacted Nashville ordinance, Bill No. 086–1549, a broad and comprehensive ordinance providing for the licensing and regulation of "adult-oriented establishments." The ordinance provides for the licensing and regulation of the business premises, the employees and entertainers of these "adult-oriented establishments" and regulates the use and construction of the interiors of these establishments.

Then, the plaintiffs filed this action seeking declaratory and injunctive relief against the enforcement of the ordinance.

## II.

It is a fundamental precept of the First Amendment to the United States Constitution that all expression, whether it is written, pictorial or by way of performance, is presumptively protected against government interference and restraint. *Doran v. Salem Inn, Inc.* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Only in exceptional circumstances, such as when the expression is judicially determined to be obscene, does the expression lose its protected status. *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In this case, it is stipulated that there is no contention or issue that minors are allowed on the plaintiffs' business premises or that any material sold or live performance exhibited violated the obscenity laws. (Stipulation No. 20). Therefore, the kinds of expression occurring at the plaintiffs' places of business are presumptively protected by the First Amendment to the Constitution of the United States.

■ In considering legislation, in the form of licensing requirements or any other form, the Supreme Court has stated that when challenges are raised on the ground that the legislation affects First Amendment rights:

> the standard of review is determined by the nature of the right assertedly threatened or violated rather than the power being exercised or the specific limitations being imposed. *Thomas v. Collins*, 323 U.S. 516, 529–530 [, 65 S.Ct. 315, 322, 89 L.Ed. 430] (1945).

*Schad, supra* at 68, 101 S.Ct. at 2182. Accordingly, where First Amendment rights of freedom of expression are affected by state action, the obligation and mandate to the reviewing court is to review the validity and constitutionality of such action under basic principles of First Amendment law.

■ Due to the First Amendment's paramount position among all constitutional

rights, due process under the Fourteenth Amendment to the United States Constitution requires that all laws which seek to regulate First Amendment activities must be sufficiently definite and certain so as not to be impermissibly vague. The purpose for this requirement was set forth in *Entertainment Concepts, Inc. III v. Maciejewski*, 631 F.2d 497, 501 (7th Cir.1980), *cert. denied* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981):

> The vagueness doctrine rests on the due process requirement of notice. *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 1246, 39 L.Ed.2d 605 (1974). Due process requires that an Ordinance have a minimum degree of definiteness so that an individual has 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices' *Jordan v. DeGeorge*, 341 U.S. 223, 231–32, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951).
>
> [We] insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide specific standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries, for resolution on an *ad hoc* and subjective basis, with attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of those freedoms.' Uncertain meanings lead citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked' (citations omitted). *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).

The standard to be applied in determining vagueness is whether the law "requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

For similar reasons, laws which are overbroad, threatening the exercise of First Amendment rights, are unconstitutional. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Grayned, supra; Schad, supra; Doran, supra.* The Supreme Court has held that a government's purpose, no matter how praiseworthy, cannot be pursued by means that stifle broad fundamental liberties when the end can be more narrowly achieved. A legislature must achieve its goal by means which have a less drastic impact on the continued vitality of First Amendment freedoms. *United States v. Robel*, 389 U.S. 258, 268, 88 S.Ct. 419, 426, 19 L.Ed.2d 508 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Therefore, laws that impose restrictions so broad as to create a "chilling effect" which would necessarily curtail the availability of non-obscene expression because of concern over violating the laws are unconstitutional. *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1962).

However, neither the First Amendment nor the Equal Protection Clause of the Fourteenth Amendment prohibit the Metropolitan Government from classifying adult-oriented establishments differently from other places, even if First Amendment rights are impacted thereby. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986); *Paris Adult Theatre I v. Slayton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Renton v. Playtime Theatre*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268 (5th Cir. 1988); *Broadway Books, Inc. v. Roberts*, 642 F.Supp. 486 (E.D.Tenn.1986). Moreover, prostitution and other illegal sexual activities carried out in adult bookstores

embody no element of protected First Amendment expression. Sanctions against such activities (including closure of the bookstore) are not subject to the "least restrictive means" test generally applied to laws governing First Amendment Activities. *Acara, supra.* The Supreme Court has repeatedly held that when "speech" and "nonspeech" elements are intertwined and regulation of the nonspeech conduct or portion is justified, incidental limitations on the First Amendment may be imposed. Regulation of adult bookstores may infringe upon expression protected under the First Amendment if the regulation is content neutral and allows alternative means of expression. *Arcara, supra; Paris Adult Theatre I, supra; Renton, supra; SDJ, Inc., supra; Broadway Books, Inc., supra; Wall Distributors, Inc. v. City of Newport News, Va.,* 782 F.2d 1165 (4th Cir.1986); *Berg v. Health and Hospital Corporation of Marion County, Ind.,* 667 F.Supp. 639 (S.D.Ind.1987); *Doe v. City of Minneapolis,* 693 F.Supp. 774 (D.Minn.1988).

In *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court held that a content neutral ordinance may restrict the time, place and manner of the exercise of First Amendment rights if it satisfied the following requirements:

1. The ordinance furthers an important or substantial government interest.

2. The governmental interest is unrelated to the suppression of free expression.

3. The burden on the First Amendment freedom is no greater than incidental to the furtherance of the government interest.

The *O'Brien* test[1] has been applied to the licensing and regulation of adult-oriented establishments, in as much as the regulation of such establishments necessarily touches upon and affects First Amendment

freedoms. *Genusa v. City of Peoria,* 619 F.2d 1203 (7th Cir.1980).

## III.

■ In this case, the Court finds that the evidence is undisputed that the ordinance furthers an important and substantial government interest. And, that interest is unrelated to the suppression of free expression. Sexual acts have been a regular occurrence at the adult-oriented establishments that provide private or semi-private booths or cubicles for viewing films or live sex shows. (Docket No. 63, Vol. II, pp. 207–208; Vol. III, p. 37). Sexual acts in these types of establishments have been observed by officers of the Metro Police Department and have included heterosexual and homosexual prostitution, oragenital sex acts, male and female masturbation and sexual intercourse. (Docket No. 63, Vol. II, pp. 208, 212; Vol. III, p. 37). The above-referenced sexual acts have been committed by and between patrons, employees and patrons and prostitutes who took their clients into adult-oriented establishments to transact their business. (Docket No. 63, Vol. II, pp. 208, 212; Vol. III, pp. 35–37). Generally, the private or semi-private booths and cubicles in these establishments were built with a back wall of plexiglass which had a round hole eight to ten inches in diameter, behind which would be an entertainer. In addition, the door on the booth or cubicle would have a lock. In Ellwest Stereo Theatre and Adult World, another adult-oriented establishment, it was common practice for entertainers to offer sex acts to the patrons. Presumably, the sex acts were committed by the use of the hole in the plexiglass. (Docket No. 62, Vol. II, pp. 210–211, Vol. III, pp. 34–37). Police officers and Health Department inspectors also noticed holes in the walls between booths and cubicles in many adult-oriented establishments.

---

**1.** The *O'Brien* test is often considered to have a fourth requirement that the government have the power to enact the ordinance. However, in this case, there is no dispute that Metro had the power to enact the ordinance. Tennessee municipalities have broad, inherent powers to enact legislation to protect the health and safety of

their citizens. *Penn Dixie Cement Corp. v. Kingsport,* 189 Tenn. 450, 225 S.W.2d 270 (1949). In addition, the State of Tennessee has conferred broad police power upon Metropolitan governments. Tenn.Code Ann. §§ 7–2–108 and 7–3–101.

(Docket No. 63, Vol. III, p. 35; Exhibit D–1).

The then Director of Health for Metro, Dr. J.M. Bistowish, was informed of the general nature of the conditions found by the Metropolitan Vice Squad. (Docket No. 63, Vol. II, pp. 179, 182). In response to a complaint over sanitary conditions from a merchant in the area of lower Broadway, Dr. Bistowish directed health inspections of all the premises in the area, including adult-oriented establishments. (Docket No. 63, Vol. II. p. 178). The results of the inspections of the adult-oriented establishments in Nashville (Docket No. 63, Vol. II., p. 178) are as follows. Eight (8) adult-oriented establishments with booths and cubicles for viewing films, videotapes, or live entertainment and one adult movie theater were inspected by Metropolitan Health Department employees, Bobby Nichols and Jeff Castleberry, in the summer of 1986. The following adult-oriented establishments were inspected:

 a. The Wheel, 421 Broadway
 b. Swinger's World (operated by First Amendment Books), 400 Broadway
 c. Midtown Cinema, 713 Church Street
 d. Ellwest Theater, 418 Broadway
 e. Purple Onion, 2807 Nolensville Road
 f. Classic Arts, 2702 Dickerson Road
 g. Carousel, 5606 Charlotte Avenue
 h. Adult World, 412 Broadway
 i. Adult World, 2407 Dickerson Road

Messrs. Nichols and Castleberry found semen in some booths in each establishment and noted this on their report. They also found fecal matter in many booths and on the walls and floors of a few of the bathrooms. Other unsanitary conditions were widespread. (Docket No. 63, Vol. III, pp. 19–25, 27; Exhibit D–1). Dr. Bistowish was made aware of the findings regarding unsanitary conditions found in the Health Department's inspection. (Docket No. 63, Vol. II, pp. 178–79). There are at least fifty communicable diseases which are subject to being spread in the environment existing and the conduct occurring at the establishments inspected by Messrs. Nichols and Castleberry in 1986 and 1987. The diseases most subject to being spread are syphylis, gonorrhea, human immunodeficiency virus infection (AIDS), genital herpes, hepatitis A, amebiasis, salmonella infections and shingella infections. (Docket No. 63, Vol. II, pp. 167–75).

In the late spring of 1986, Dr. Bistowish learned that Chattanooga, Tennessee, had enacted a comprehensive ordinance to license and place some controls on adult-oriented establishments located in Chattanooga. He also learned that the ordinance had been upheld in a federal court challenge. Dr. Bistowish received a copy of the ordinance and the court opinion, as well as a copy of a similar ordinance from Kansas. (Docket No. 63, Vol. II, p. 178). Dr. Bistowish directed Mr. Bob Eadie, the Health Department's Director of Personnel Services and Assistant Director of Finance, to draft an ordinance similar to the Chattanooga ordinance. (Docket No. 63, Vol. II, p. 178). Prior to drafting the ordinance, the Health Department compiled information regarding the incidence of sexually-transmitted diseases and AIDS traceable to adult-oriented establishments in Nashville. The primary sources were the records of its own clinic for sexually-transmitted diseases and information provided by medical personnel in the clinic. (Docket No. 63, Vol. II, pp. 180–83). No studies were performed to determine what percentage of Nashville's sexually-transmitted diseases arose from activity at adult-oriented establishments because Dr. Bistowish thought that the number of cases reported to the Metropolitan Health Department was significant in itself, so a study would have served no purpose. (Docket No. 63, Vol. I, pp. 49–50; Vol. II, pp. 198–202). The Metropolitan Council did not conduct any public hearings or make separate findings regarding the ordinance. However, during the process of preparing the ordinance, several meetings were held between Dr. Bistowish, Mr. Eadie and officials of the Metropolitan Police, Fire and Codes Departments. The meetings were informational in nature and each department's representative informed Dr. Bistowish as to which provisions of the Chattanooga ordinance were applicable to Nashville. (Docket No. 63, Vol. I, pp. 40–

41, 46–47, 100, 128; Vol. II. pp. 179, 186). The prime objective of Dr. Bistowish and the staff of the Metropolitan Health Department in drafting and proposing the ordinance was to protect and enhance public health by reducing the spread of sexually-transmitted diseases and other diseases which could thrive and be transmitted in the conditions found to be prevalent in the majority of adult-oriented establishments in Nashville. (Docket No. 63, Vol. I, p. 39). There was no stated objective to close down all such businesses and no discussion to that effect. Nor was there any interest in the content of the materials sold or exhibited at the adult-oriented establishments. (Docket No. 63, Vol. I., pp. 38–39; Vol. II, pp. 56–67, 92, 144, 185–86, 188).

The ordinance contains two and one-half pages of recitals. These recitals include several paragraphs concerning sexual activities at adult-oriented establishments, ten paragraphs containing statistics and information about AIDS, two paragraphs citing homosexual activity at local adult bookstores by persons infected with AIDS, and one paragraph regarding cases of syphylis seen at the Health Department and traceable to sexual conduct at local adult-oriented establishments. (Docket No. 61, Attachment G). Section 1 of the ordinance states the findings and purpose of Metro. The findings include (1) statements citing the occurrence of homosexual and heterosexual acts at adult-oriented establishments; (2) a finding that the operation and environment of adult-oriented establishments is conducive to prostitution and other crimes; (3) a finding that such establishments should be regulated to promote public health and safety. (Docket No. 61, Attachment G).

The evidence is clear that this ordinance was implemented to further an important and substantial government interest to protect and enhance public health by reducing the spread of diseases which thrive in the conditions created by the unregulated adult-oriented establishments. It is also clear that this governmental interest is unrelated to the suppression of free expression. Therefore, the requirements of the first and second element of the *O'Brien* test are satisfied.

## IV.

Accordingly, the issue to be determined with respect to the plaintiffs' First Amendment claims is whether the requirements of the third element of the *O'Brien* test are satisfied. Only those regulations narrowly tailored to serve substantial and legitimate government interests, without unnecessarily infringing upon fundamental First Amendment interests, will withstand constitutional scrutiny. *O'Brien, supra.* The plaintiffs contend that the ordinance imposes greater restrictions on the plaintiffs' First Amendment freedoms than is essential to the furtherance of government interest. The government contends that the restrictions on the plaintiffs' First Amendment freedoms are reasonable and necessary.

## A. THE DISCLOSURE REQUIREMENTS

Section 3(a) of the ordinance provides that no "adult-oriented establishment" shall be operated or maintained without being issued a license. In order to obtain a license, an applicant must furnish the fourteen different items of information required by Section 4(b)(1) through (14) of the ordinance. Under Section 4(b), the following persons must submit an application. Any applicant includes (1) any partner or limited partner of a partnership applicant; (2) any officer or director of a corporate applicant or any stockholder holding five percent or more of the stock of a corporate applicant; and (3) any person who is "interested directly" in the ownership or operation of the business.

The plaintiffs contend that if, as the ordinance purports, its purpose is related to health and the prevention of the spread of AIDS and other sexually-transmitted diseases, there is no reasonable relationship between the requirement that stockholders, limited partners, and anyone "interested directly" in the ownership of the business provide the information required by Section 4(b)(1) through (14) of the ordinance and the stated purpose of the ordinance. The

plaintiffs contend that there is no relationship between owners such as stockholders, who are not included in the management and operation of adult-oriented establishments, and the conditions at those establishments which cause the spread of disease. Accordingly, the plaintiffs argue that there is no substantial government interest which justifies the requirement that the stockholders, limited partners and anyone "interested directly" in the ownership of the business provide the information set forth in 4(b)(1) through (14) of the ordinance.

Mr. Eadie conceded that these requirements that shareholders, limited partners, and those persons "interested directly" in the ownership of the business make certain disclosures have no reasonable relationship to the stated purpose of the ordinance. (Docket No. 63, Vol. I, pp. 98–100). However, Mr. Eadie testified that they incorporated this requirement into the ordinance because it was included in a Chattanooga ordinance which the United States District Court for the Eastern District of Tennessee found to be constitutional in the case of *Broadway Books, supra.* Metro seems to rely exclusively on this "Chattanooga defense" as a justification for all the language in the ordinance for which it cannot articulate a rational relationship to the stated purpose of the ordinance. However, Metro ignores the fact that most of the language in the ordinance was not challenged by the plaintiffs in *Broadway Books, supra,* and therefore was not specifically addressed by the Court in that case.

In this case, the Court finds that there is no rational relationship between the substantial government interest of preventing the spread of disease and the requirement that persons with ownership interests in the adult-oriented establishments provide the information and disclosures required by Section 4(b)(1) through (14). Persons who solely have ownership interests in adult-oriented establishments, such as limited partners and shareholders, have no responsibility for the day-to-day operations of the business and, therefore, are not charged with operating such establishments in accord-

ance with the ordinance in order to prevent the spread of disease. Accordingly, the disclosure requirements, as they apply to persons who have only an ownership interest in these business enterprises are not reasonably related to the purpose of the ordinance.

In *Pentco, Inc. v. Moody,* 474 F.Supp. 1001 (S.D. Ohio 1978), the court reached a similar conclusion when referring to a similar disclosure provision in a licensing scheme involving the regulation of massage parlors:

The disclosure required by § 540–04(c) applies to 'any partner or limited partner of a partnership, and any officer or director of a corporate applicant and any stockholder holding more than ten (10) percent of the stock of a corporate applicant.' The Court believes that a legitimate governmental interest is served by requiring disclosure as to partners, officers, and directors since these are the individuals usually associated with the management and operation of a corporation's business. This requirement provides information to the city licensing agency on those individuals who would most likely be involved in the day-to-day operation of the massage establishment whether the application is made by the individual or through a partnership or corporate entity. The Court cannot find a similar governmental interest with respect to limited partners and stockholders who ordinarily possess only an investment interest and are not involved in day-to-day management. The identity and personal history of such investors in partnerships and corporations which operate massage establishments is simply not reasonably related to legitimate government interest.

Other courts have also consistently struck down disclosure provisions relating to stockholders and persons having only a financial interest in a business on the basis that there is insufficient necessity on the part of the government to justify such an intrusion into fundamental First Amendment rights. *Genusa, supra; Broadway*

*Distributing v. White,* 307 F.Supp. 1180 (D.C.Mass.1970).

The Court finds that here, as in *Pentco,* there is no government interest in determining the identity and personal history of limited partners and stockholders who ordinarily are not involved in the day-to-day business of the adult-oriented establishments. Accordingly, there is no governmental necessity sufficient to justify the intrusion into the plaintiffs' First Amendment rights of requiring the disclosure of this information for licensing purposes. Therefore, the requirements of Section 4(b) of the ordinance that stockholders holding five percent or more of the stock of the corporate applicant, limited partners and anyone "interested directly" in the ownership of the business provide the information required under Section 4(b)(1) through (14) of the ordinance improperly impinge on the plaintiffs' First Amendment rights and are unconstitutional.[2]

■ However, the Court finds that there is a rational relationship between the stated government interest and the requirement that those persons operating and managing the adult-oriented businesses provide the information required under Section 4(b)(1) through (14) of the ordinance. Those persons operating or managing the businesses are responsible for maintaining the premises as required under the ordinance and are therefore responsible for operating the business in such a manner as to prevent the spread of sexually-transmitted diseases. Accordingly, there is clearly a rational relationship between the disclosure requirements with respect to those persons operating and managing the adult-oriented establishments and the stated purpose of the ordinance.

The plaintiffs also contend that certain disclosures required pursuant to Section 4(b)(1) through (14) of the ordinance unduly restrict their freedom of association and right to privacy under the First Amendment. The plaintiffs concede that the provisions relating to the name and address of the applicant, 4(b)(1); proof of age, 4(b)(2); address, 4(b)(3); name of business and proposed location, 4(b)(9); and statement of familiarity and compliance with the ordinance, 4(b)(13), are rationally related to the government's interest. However, the plaintiffs contend that the remaining disclosure requirements, 4(b)(4), (5), (6), (7), (8), (10), (11), (12) and (14) violate the applicant's rights under the First Amendment. The plaintiffs further contend that because no other business located in Metro's jurisdiction is required to disclose the information required by these provisions, the ordinance discriminates against the plaintiffs based upon the business in which they are engaged and, in particular, the content of the First Amendment protected materials and performances which are sold or occur on the business premises.

■ The plaintiffs contend that forcing them to divulge the information called for by the ordinance would have the effect of infringing on their right of association protected by the First Amendment. In this regard, it has been held by the Supreme Court that, "compelled disclosure, in itself, can seriously infringe on the privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). Similarly, the Supreme Court has held that it is "immaterial whether the belief sought to be advanced by association pertain to political, economic, religious or

2. The defendants contend that the reason for Metro's interest in the ownership of the adult-oriented establishments is that Metro Police Department officials expressed the belief that organized crime has, in the past, been involved in some aspects of the ownership or operation of adult-oriented establishments in Nashville. (Docket No. 63, Vol. II, pp. 103–104, 106, 133). However, Major Woods, a Metro Police Officer, testified that there was no concrete evidence that organized crime was involved in the operation of adult-oriented establishments and the

belief that organized crime might be involved was based solely on rumors. (Docket No. 63, Vol. II, p. 133).

In light of the fact that there is no evidence whatsoever of the involvement of organized crime in the adult-oriented business in Nashville, the Court finds that there is no substantial government interest in information regarding owners of the adult-oriented establishments for the purpose of preventing the licensing of adult-oriented establishments owned by organized crime syndicates.

cultural matters." *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). In order for a governmental instrumentality to be constitutionally able to infringe upon this right, it is necessary that there be a substantial relationship between the information sought to be disclosed and a significant governmental interest to be furthered by such disclosure. *Buckley, supra; Gibson v. Florida Legislative Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Alabama, supra.* This strict standard was enunciated by the Supreme Court due to concern over the effect disclosure would have on individuals and groups involved in the advocacy of unpopular political ideas. However, this strict standard does not necessarily apply when the type of association involved is one in which individuals have joined together for the purpose of engaging in profit-making activity and when the speech in question is a "type of expression [which] is of a wholly different, and lesser magnitude, than the interest in untrammelled political debate," such as the erotic materials at issue in this case. *Young v. American Mini Theatres,* 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310. In *Young,* the Supreme Court held that the equal protection clause of the Fourteenth Amendment does not prohibit the separate statutory classification of adult-oriented establishments from other businesses, even though First Amendment rights may be impacted thereby, so long as the classification is based on rational and reasonable grounds and done in furtherance of an important and substantial government interest. *Young, supra.* 427 U.S. at 70–71, 96 S.Ct. at 2452, 49 L.Ed.2d at 326 (1976). Accordingly, the disclosure requirements for the operation of an adult-oriented establishment may be more stringent than those imposed on another First Amendment protected enterprise and the ordinance at issue is not unconstitutional simply because it imposes disclosure requirements on adult-oriented establishments which are not imposed on other businesses.

As to particular provisions requiring disclosures, the plaintiffs contend that there is no reasonable relationship between the government's interest in preventing the spread of disease and the requirement that the applicant disclose his previous occupations and whether he previously operated under an adult-oriented establishment license or similar business license. (Sections 4(b)(5) and (6)). The defendants contend that these requirements aid the Metro Police Department in its duty to conduct a background check of each applicant's license as required by Section 4(c). However, Mr. Eadie testified that as far as he could determine there was no relevance between the requirements and the stated purpose of the ordinance. (Docket No. 63, Vol. I, pp. 104, 107, 119). The Court finds that there is no reasonable relationship between the stated government interest of preventing the spread of disease and requiring the disclosure of the previous occupations engaged in by the applicant, particularly in light of the fact that prior occupations have no relationship to the standards for the issuance or denial of a license as set forth in Section 5 of the ordinance. The Court, however, does find that a reasonable relationship exists between the stated government interest of preventing the spread of disease and the requirement that an applicant disclose whether he previously operated an adult-oriented establishment or similar business. This disclosure allows the Metro Police Department to determine whether the applicant operated his former business in compliance with the ordinance. (Docket No. 63, Vol. II, pp. 103–104). An applicant who had previously operated an adult-oriented business in contravention of the ordinance might be more likely to continue to operate his business in contravention of the ordinance and thereby contribute to the spread of disease. Therefore, the conduct of an applicant during his prior operation of a similar business is relevant to the consideration of whether to grant or deny a license. Accordingly, the Court finds that this disclosure requirement bears a substantial relationship to a compelling government interest which justifies this slight intrusion on the applicant's First Amendment rights.

The plaintiffs also contend that Section 4(b)(7), which requires that an applicant disclose "all criminal statute violation convictions [federal, state, or city], forfeiture of bond and pleas of *nolo contendere* to all charges except minor traffic violations" bears no reasonable relationship to any legitimate purpose of the ordinance. The ordinance requires information on crimes of whatever nature, without any limit as to the time frame. The plaintiffs contend that much of the information sought is irrelevant because it is not limited to crimes which serve as a basis for a denial of a license. Under Section 5(a)(1)(ii), an application for a license must be denied if the applicant has been convicted or pleaded *nolo contendere* "to a felony or any crime involving moral turpitude, prostitution, obscenity or any crime of a sexual nature in any jurisdiction within five (5) years immediately preceding the date of the application." The Court agrees that to the extent that the information sought concerning prior crimes exceeds those crimes which serve as a basis for which an application for a license must be denied, the information sought is irrelevant. In addition, the Court finds that even to the extent that the information sought tracks the crimes which serve as a basis for a denial of a license application, the ordinance is unconstitutionally overbroad. Qualifications of an applicant for a license must serve legitimate and substantial interests unrelated to the suppression of speech which cannot be effectuated by means that impact less drastically on fr speech. *Genusa, supra; Pentco, supra.* In this case, the Court finds that the mere fact that an applicant has been convicted of a felony during a five-year period preceding the date of the application does not support a reasonable inference that the applicant would operate an adult-oriented establishment in a manner in contravention of the ordinance. Although the fact that an applicant may have been convicted of or pled *nolo contendere* to crimes such as prostitution may support

a reasonable inference that the applicant would be more likely to operate an adult-oriented establishment in contravention of the ordinance, the ordinance in its present form is not limited to such crimes, and therefore, the Court cannot find that there is a reasonable relationship between these required disclosures and the stated purpose of the ordinance. Accordingly, these requirements do not serve the stated purpose of the ordinance.

The plaintiffs further contend that Section 4(b)(14), which requires an applicant to provide a full inventory of any and all inventory, equipment, or supplies, as well as the distributor's business name, address, phone number and representative's name is unreasonable and bears no rational relationship to the stated purpose of the ordinance. Again, Mr. Eadie testified that this disclosure provision bears no rational relationship to the stated purpose of the ordinance. (Docket No. 63, Vol. I, pp. 111–13). Dr. Bistowish further testified that the inventory reporting requirement of Section 4(b)(14) was imposed not in connection with the stated purpose of the ordinance but as a result of the interest of the Metro Police Department in criminal or underworld involvement in the supply of stock to adult-oriented establishments. (Docket No. 63, Vol. II, p. 168). Therefore, the requirement that an applicant provide a full inventory of any and all inventory, equipment, or supplies, as well as the distributor's business name, address, phone number and representative's name bears no relationship to the stated purpose of the ordinance.[3]

The plaintiffs also contend that Sections 4(b)(4) and 4(b)(8) bear no rational relationship to the stated purpose of the ordinance. Section 4(b)(4) requires that the applicant disclose the applicant's height, weight and color of eyes and hair. Section 4(b)(8) requires that the applicant provide fingerprints and two photographs of the applicant. Mr. Eadie testified that al-

---

**3.** However, as discussed above, there is no evidence whatsoever of involvement of organized crime in the adult-oriented businesses in Nashville. Accordingly, the Court finds that there is

no substantial government interest in determining the suppliers of adult-oriented establishments.

though these requirements were not directly related to the prevention of the spread of sexually-transmitted diseases, the stated purpose of the ordinance, these requirements were essential to the administration of the regulation. Mr. Eadie testified that the photographs required by Section 4(b)(8) and the information required by Section 4(b)(4) are necessary for the actual process of issuing the license. (Docket No. 63, Vol. I, pp. 16–19). The Court disagrees. This is not a license, such as a driver's license, which is issued to an individual, and which contains a picture of the individual, as well as a description of his or her height, weight, hair and eye color so that the person carrying the license can be identified as the licensee. A license to operate an adult business can be issued to an individual, a partnership or a corporation. In addition, the person or persons actually managing the business on a day-to-day basis may be different from the person or entity to whom the license is issued. Accordingly, a person enforcing this ordinance may be called upon to determine whether an establishment has a valid and proper license but will not be called upon to determine whether the person physically at the establishment is the licensee. Therefore, photographs of the applicant, as well as information regarding the applicant's height, weight and eye and hair color are not necessary for the issuance of the license or the administration of the ordinance. Therefore, these requirements constitute an unconstitutional infringement on the plaintiffs' First Amendment rights.

The plaintiffs also contend that there is no rational relationship between Section 4(b)(3) of the ordinance and the stated purpose of the ordinance. Section 4(b)(3) requires that the applicant provide all residential addresses of the applicant for the past three years. The defendants contend that this information, as well as the fingerprints and the photographs required by Section 4(b)(8) are necessary to assist the Metro Police Department in the investigation of the applicant. Insofar as the police investigation may be necessary to determine if an applicant has been convicted of a felony or any crime involving moral turpitude, prostitution, obscenity or any crime of a sexual nature within five years of the application, the police investigation is necessary to make a determination of the applicant's eligibility for a license under Section 5 of the ordinance. Therefore, if Section 5(a) of the ordinance was limited to crimes which bear a rational relationship to the stated purpose of the ordinance, Sections 4(b)(3) and 4(b)(8) also bear a reasonable relationship to the stated purpose of the ordinance. However, the Court has previously held that Section 5(a) includes many offenses which bear no relationship to an applicant's eligibility to operate an adult-oriented establishment and therefore is constitutionally overbroad. Accordingly, the Court finds that under the ordinance in its present form the requirements of Sections 4(b)(3) and 4(b)(8) do not bear a rational relationship to the stated purpose of the ordinance.

Section 4(b)(10) of the ordinance requires that the applicant disclose the names and addresses of all persons, partnerships or corporations holding any beneficial interest in the real estate upon which the adult-oriented establishment is to be operated including, but not limited to, contract purchasers or sellers, beneficiaries of land trusts, or lessees subletting to the applicant. Section 4(b)(11) provides that if the premises are leased or are being purchased under contracts, a copy of such lease or contract shall accompany the application. Mr. Eadie conceded at trial that the disclosure requirements of Sections 4(b)(10) and 4(b)(11) bear no rational relationship to the stated purpose of the ordinance. (Docket No. 63, Vol. I, pp. 116 and 120), and the Court can find no reasonable relationship between this information and the prevention of the spread of sexually-transmitted disease. Accordingly, the Court finds that the requirements of Sections 4(b)(10) and 4(b)(11) constitute unconstitutional restraints on the plaintiffs' First Amendment rights.

Finally, Section 4(b)(12) provides that if the applicant is a corporation, the application shall specify the name of the

corporation, the date and state of incorporation, the name and address of the registered agent and the name and address of all principal shareholders, officers and directors of the corporation. The plaintiffs contend that the required disclosure of the name and address of all principal shareholders, officers and directors of the corporation bears no reasonable relationship to the stated purpose of the ordinance. As discussed above, the Court finds that there is no rational reason for requiring information about shareholders who are not involved in the day-to-day operation of the adult business. However, as officers and directors of a corporation are ultimately responsible for the day-to-day operation of the business and therefore are responsible for insuring that the business is operated in accordance with the ordinance, the Court finds that the requirement that a corporate applicant provide the names and addresses of the officers and directors of the corporation bears a rational relationship to the stated purpose of the ordinance.

### B. THE INVESTIGATION REQUIREMENTS

After an application is submitted to the Health Department, a copy of the application is delivered to the Police Department for purposes of investigation. Section 4(a) of the ordinance also requires that an inspection of the proposed premises be made by the Health Department, the Codes Administration and the Fire Marshal prior to the issuance of a license. The plaintiffs contend that the required inspections by the Health Department, the Codes Administration and the Fire Marshal are essentially duplications of the periodic inspections required to be performed by these departments and are nothing more than a disguised form of harrassment through the placement of additional restrictions on the issuance of a license with no legitimate purpose in fact or law. Accordingly, the plaintiffs contend that the inclusion of these requirements in the ordinance constitute an unlawful prior restraint on their First Amendment rights.

■ Again, the issue to be determined is whether the required investigations by the Health Department, the Codes Administration and the Fire Marshal are reasonably related to the substantial government interest of preventing the spread of sexually-transmitted diseases.

The defendants have not set forth any rational relationship between the requirement that the proposed establishments be inspected by the Codes Administration and the Fire Marshal and the stated purpose of the ordinance and the Court finds that there is none. However, as the Health Department is responsible for ensuring compliance with the ordinance, the Court finds that there is a rational relationship between the requirement and the Health Department inspection of the premises and the stated purpose of the ordinance.

■ The plaintiffs further contend that the ordinance is unconstitutionally vague inasmuch as it allows Metro to take an unlimited amount of time in which to review and decide whether a license should be issued. Under Section 4(c) of the ordinance, the Health Department must notify an applicant whether his application is granted, denied or held for further investigation within ten (10) days of receiving the results of the investigations conducted by the Police Department, Health Department, Codes Administration and the Fire Marshal. These investigations must be completed within twenty (20) days from the date of the application. Accordingly, the Health Department has thirty days within which to notify an applicant as to whether his application has been granted, denied or held for further investigation. Any additional investigation shall not exceed an additional thirty (30) days unless agreed to by the applicant. Accordingly, on its face, the ordinance requires that the Health Department make a determination with respect to an application within sixty (60) days of the submission of the application unless the applicant agrees to an extension.

However, Section 4(e) of the ordinance provides that

[f]ailure or refusal of the applicant to give any information relevant to the in-

vestigation of the application, or his or her refusal or failure to appear at any reasonable time and place for examination regarding said application by his *refusal to submit or to cooperate with any investigation required by this ordinance,* shall constitute an admission by the applicant that he or she is ineligible for such license and shall be grounds for denial thereof by the Health Department. (emphasis added)

The plaintiffs contend that under Section 4(e) the applicant is required to agree to any and all extensions and that, therefore, there is essentially no limit to the time period by which the Health Department must act on an application.

The Court disagrees. Section 4(e) requires an applicant (1) to give any information relevant to the investigation of the application, (2) to appear at any reasonable time and place for examination regarding said application and (3) to submit to or to cooperate with any investigation required by the ordinance. Nothing in Section 4(e) requires an applicant to submit to any extension requested by the Health Department. Accordingly, the Health Department must make its determination within sixty (60) days of the filing of the application unless the applicant agrees otherwise (or fails to cooperate within the sixty days so that the investigations can be completed within the required time).[4]

Section 5 of the ordinance provides the standards for the issuance of a license. The ordinance provides that no license shall issue if an applicant, officer, director or stockholder of a corporate applicant, or any person having a financial interest in a partnership or other organizational applicant has been convicted of or pled *nolo contendere* "to a felony or any crime involving moral turpitude, prostitution, obscenity, or any crime of a sexual nature in any juris-

diction within 5 years immediately preceding the date of the application." The plaintiff contends that these disqualifying crimes are not reasonably related to the legitimate purpose of the ordinance because they do not bear a reasonable relationship to the qualifications of an individual or corporation to operate an adult-oriented establishment in a safe and healthy manner.

The Court would first note that, as discussed above, the actions of shareholders, limited partners and other persons not having an interest in the actual operation of the business are not reasonably related to the stated purpose of the ordinance, the operation of adult-oriented business so as to prevent the spread of sexually-transmitted diseases. Therefore, the Court finds that the requirement that a license not be issued if a shareholder, limited partner or person having a financial interest has been convicted of or pled *nolo contendere* to certain crimes is not reasonably related to the stated purpose of the ordinance. In addition, also as discussed above, the Court finds that to the extent that this provision requires the denial of a license application if an applicant has been convicted of any felony, the provision bears no rational relationship to the purpose of the ordinance. The fact that any applicant may have been convicted of a crime such as forgery does not support an inference that an applicant would run an adult-oriented establishment in contravention of the ordinance and, therefore, clearly is not reasonably related to the stated purpose of the ordinance. Moreover, although the fact that an applicant may have been convicted of or pled *nolo contendere* to a crime such as prostitution may support a reasonable inference that the applicant would be more likely to operate an adult-oriented estab-

4. The plaintiffs contend that the Health Department's failure to have issued any licenses or permits within sixty (60) days is evidence that there is virtually no time limit on the Health Department's decision of whether to issue a license or a permit. The Court recognizes that at the time of trial, almost two years after the enactment of the ordinance, few licenses and permits had been issued. However, Mr. Eadie

testified that the enforcement of the ordinance had in effect been put on hold pending the outcome of this action. (Docket No. 63, Vol. I, p. 159). Accordingly, the Health Department's failure to act during this time is not evidence of the failure of the ordinance to place an effective time frame on the Health Department's decision of whether or not to issue a license or permit.

lishment in contravention of the ordinance, the ordinance is not limited to such crimes and, therefore, the Court cannot find that a reasonable relationship exists between the standards for the issuance of a license and the stated purpose of the ordinance.[5]

■ The plaintiffs also contend that the requirement that an individual be denied a license as a result of having been convicted of a certain crime is, in effect, an additional penalty for the commission of a crime and therefore, violates the double jeopardy provision of the United States Constitution. However, the Fifth Amendment's prohibition against double jeopardy, as applied to the states through the Fourteenth Amendment only addresses criminal prosecutions. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970); Annotated–Double Jeopardy–State Prosecutions, 25 L.Ed.2d 968. Accordingly, this contention is meritless.

## C. PERMITS FOR ENTERTAINERS AND EMPLOYEES

■ Section 6 of the ordinance provides that any entertainer or employee must obtain a permit prior to working on the premises of an adult-oriented establishment. The plaintiffs contend that this requirement is not reasonably related to the purpose of the ordinance because there is no evidence that the entertainers and employees of adult-oriented establishments engage in conduct which promotes the spread of sexually-transmitted diseases. The Court disagrees. Officer Larry B. Feltz testified that at certain adult establishments entertainers offered to perform sexual acts. (Docket No. 63, Vol. III, pp. 35–36). These establishments include plaintiff Ellwest Stereo Theatre. (Docket

No. 63, Vol. III, p. 37). Accordingly, there is evidence in the record that entertainers at adult-oriented establishments engaged in conduct that the ordinance is designed to curtail. Therefore, the requirement that entertainers be required to have a permit bears a rational relationship to the stated purpose of the ordinance. In addition, Mr. Eadie testified that "contacts" had provided information that they had contracted sexually-transmitted diseases from contact with an employee at an adult-oriented establishment. (Docket No. 63, Vol. I, p. 139). Accordingly, there is some evidence that employees of adult-oriented establishments engaged in the conduct this ordinance is designed to prevent. Moreover, certain employees in management positions will have the responsibility and duty to insure that the establishment is operated in accordance with the ordinance. The Court therefore finds that there is a reasonable relationship between the stated purpose of the ordinance and the requirement that employees possess permits.

■ However, the plaintiffs further contend that the definition of "employee" pursuant to Section 2(h) of the ordinance is constitutionally vague and overbroad. Section 2(h) of the ordinance provides:

'Employee' means any and all persons, including independent contractors, who work in or at or render any services directly related to the operation of the adult-oriented establishment.

According to Mr. Edie this is meant to apply to people who take money, make change, restock the videos, sweep the floor and shopkeep on a regular ongoing basis within an adult-oriented establishment. (Docket No. 63, Vol. I, p. 84). However, Mr. Eadie conceded at trial that the definition would cover a repairman who simply repaired a video machine at an adult-oriented establishment as one of his stops while

---

**5.** The Court should also note that the practice of denying a person a license to engage in activities protected by the First Amendment based on prior convictions is constitutionally suspect. *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Pentco, supra; Genusa, supra.* In particular, the courts have consistently struck down ordinances which permit or require the denial or revocation of a license to show adult-oriented motion pictures on the basis that an applicant or an employee of an applicant has been convicted on an obsenity charge. *Cornflower Entertainment, Inc. v. Salt Lake City Corporation,* 485 F.Supp. 777 (1980); *City of Paducah v. Investment Entertainment,* 791 F.2d 463 (6th Cir.1986); *Natco v. Ratner,* 463 F.Supp. 1124 (S.D.N.Y.1979).

repairing televisions and other audio-visual equipment on his daily rounds in the community. (Docket No. 63, Vol. I, pp. 83–84). It is evident that the definition of employee set forth in Section 2(h) of the ordinance is overbroad and would require that numerous persons who have no substantial or consistent relationship with an adult-oriented establishment obtain permits. Since there is no evidence that such persons engage in the conduct which this ordinance is designed to prevent, there is no rational reason to require such persons to possess permits. Accordingly, this provision creates greater restrictions on the plaintiffs than is essential to the furtherance of the government's interest and is constitutionally overbroad.

■ With respect to the specific disclosure requirements for an application for a permit, these requirements are essentially the same requirements set forth in the application for a license for an adult-oriented establishment. Again, the plaintiffs do not challenge the requirements that an applicant furnish his or her name, address, written proof of his or her age and a statement that the applicant is familiar with the provisions of the ordinance. However, the plaintiffs contend that the remaining required disclosures are not reasonably related to the purpose of the ordinance. Mr. Eadie testified that his responses regarding the relationship of those provisions to the stated purpose of the ordinance would be the same as the responses he gave regarding Section 4(b). (Trial Transcript, Vol. I, p. 146).

As to particular provisions requiring disclosures, the plaintiffs again contend that there is no reasonable relationship between the government's interest in preventing the spread of sexually-transmitted disease and the requirement that the applicant for a permit disclose his or her previous occupations and whether he or she has ever had his or her permit revoked while working for an adult-oriented establishment. Sections 6(b)(5) and (6). Again, the Court finds that there is no reasonable relationship between the stated government interest of preventing the spread of sexually-transmitted disease and requiring the dis-closure of the previous occupations engaged in by the applicant. The Court, however, does find that a reasonable relationship exists between the stated government interest of preventing the spread of sexually-transmitted disease and the requirement that the applicant disclose whether he or she has ever had a permit revoked and, if so, why. An applicant who has had his or her permit revoked for engaging in impermissible sexual activity is clearly more likely to engage in such conduct again and thereby contribute to the spread of sexually-transmitted disease. Therefore, the requirement that an applicant disclose his or her prior employment in an adult-oriented establishment and whether he or she has ever had his or her permit revoked bears a substantial relationship to the stated purpose of the ordinance.

■ The plaintiffs also contend that Section 6(b)(7) which requires that an applicant for a permit disclose "all criminal statute violation convictions [federal, state, or city], forfeiture of bond and pleas of *nolo contendere* on all charges except minor traffic violations" bears no rational relationship to the stated purpose of the ordinance. Again, the Court finds that to the extent that the information sought concerning prior crimes exceeds those crimes which have a bearing on whether an applicant would work in an adult-oriented establishment in compliance with, or contravention of, the ordinance, it does not have a rational relationship to the stated purpose of the ordinance. The fact that an applicant may have been convicted of a felony, such as forgery, or pleaded *nolo contendere* to an offense such as tax evasion, does not support an inference that the applicant is more likely to engage in conduct in contravention of the ordinance. Although the fact that an applicant may have been convicted of or pled *nolo contendere* to the crime of prostitution may make it more likely that the applicant would engage in acts in contravention of the ordinance, the provision is not limited to such crimes and, therefore, the Court cannot find that there is a reasonable relationship

between these required disclosures and the stated purpose of the ordinance.

■ Section 6(b)(4) of the ordinance requires that the applicant for a permit disclose the applicant's height, weight and color of eyes and hair. Section 6(b)(8) requires that the applicant provide fingerprints and two photographs. According to Mr. Eadie, the requirement that the applicant provide this information is necessary for the administration of the ordinance because the information is necessary for the actual process of issuing the permit. In this case, the permit is issued to an individual and, accordingly, a person charged with enforcing this ordinance may be called upon to determine whether the entertainer or employee carrying the permit is in fact the person to whom the permit was issued. Therefore, the Court finds that the requirement that an entertainer or employee applying for a permit provide information regarding his or her height, weight, hair and eye color, as well as photographs, is necessary for the physical process of issuing a permit and the administration of the ordinance.

■ Section 6(b)(3) of the ordinance requires that an applicant for a permit provide all the residential addresses of the applicant for the past three years. Mr. Eadie contends that this information, as well as the fingerprints and photographs required by Section 6(b)(8), are necessary to assist the Police Department in its investigation of an applicant. The police investigation is necessary under Section 7(a) of the ordinance which requires that an application be denied if an applicant was convicted of or pled *nolo contendere* to a felony or any crime involving moral turpitude, prostitution, obscenity or any crime of a sexual nature within five years preceding the date of the application. Therefore, if Section 7(a) of the ordinance was limited to crimes which bear a rational relationship to the stated purpose of the ordinance, Sections 6(b)(3) and 6(b)(8) would also bear a rational relationship to the stated purpose of the ordinance. However, just as in Section 5 of the ordinance, which related to an application for a license, Section 7(a) in-

cludes many crimes which have no relationship on the eligibility of an applicant for a permit and, therefore, is constitutionally overbroad. Accordingly, the requirements of Sections 4(b)(3) and 4(b)(8) do not bear a rational relationship to the stated purpose of the ordinance.

## D. LICENSE AND PERMIT FEES

Section 8(a) of the ordinance sets the fee for a license at $500, payable upon the submission of an application for a license. Section 8(b) sets the fee for a permit at $100, payable upon the submission of an application for a permit.

■ As a basic legal premise, a state may not impose a charge upon the exercise of a constitutional right. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Accordingly, licensing fees levied upon expression-related businesses must be nominal and imposed only as a regulatory measure to defray the expenses of policing such activities. *City of Minot v. Central Ave. News*, 308 N.W.2d 851 (N.D.1981). The rationale for this rule is that "the power to impose a license tax on the exercise of ... [First Amendment] freedoms is as potent as the power of censorship." *Murdock, supra*, 319 U.S. at 113, 63 S.Ct. at 875. The burden of proving that the fees are necessary to cover the reasonable costs of the licensing system lies with the licensing authority. *Bayside Enterprises, Inc. v. Carson*, 450 F.Supp. 696 (M.D.Fla.1978); *Milwaukee Mobilization for Survival v. Milwaukee County Park Com'n*, 477 F.Supp. 1210 (E.D.Wis.1979); *City of Minot, supra*. Where protected speech is singled out for regulation, a heavy burden of justification is placed upon the licensing agency because "differential treatment ... suggests that the goal of the regulation is not unrelated to suppression of expression and such a goal is presumptively unconstitutional." *Minneapolis Star v. Minnesota Comm'n of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983).

■ Mr. Eadie testified that the Health Department's personnel costs for process-

ing a license application are at least $145, exclusive of fringe benefits. The defendants contend that this cost, together with the costs attributable to the Police Department, the Fire Department and the Codes Administration, justify the $500 license fee. However, the Court has previously found that the investigations by the Codes Administration and the Fire Department are not reasonably related to the stated purpose of the ordinance and, therefore, are unconstitutional. In light of these findings, to the extent that the fee includes the cost of those inspections, the $500 application fee would exceed the expenses incurred in processing the application. Accordingly, the licensing fee would be excessive. In addition, the defendants provide no evidence regarding the permit fees. Accordingly, the defendants have failed to carry the burden of showing that the permit fees are necessary to cover the costs incurred in the process of issuing permits.

### E. RENEWAL PROVISIONS

 The plaintiffs contend that the renewal provisions of Section 10(a) and 10(e) of the ordinance are unconstitutional because they grant the Health Department unfettered discretion to require any information the Health Department chooses. The defendants contend that this information is limited to information required under Sections 4 and 6 for the original application for a license or permit. However, this is only Mr. Eadie's interpretation. (Trial Transcript, Docket No. 63, Vol. I. p. 191–92). The provisions themselves contain no such limitation. As discussed above, the Supreme Court has held that compelled disclosure can seriously infringe upon First Amendment rights. *Buckley, supra.* Accordingly, any required disclosure must be reasonably related to the purpose of the ordinance. Under Sections 10(a) and 10(e) of the ordinance, the Health Department has an unlimited right to compel disclosure of any and all information the Health Department chooses. Therefore, Sections 10(a) and 10(e) constitute an unconstitutional prior restraint on the plaintiffs' First Amendment rights.

### F. LICENSE AND PERMIT REVOCATION AND SUSPENSION PROCEDURES

 The plaintiffs contend that Sections 11(a)(1), 11(a)(2) and 14(a) of the ordinance are unconstitutional because they are overbroad and constitute an unlawful prior restraint against First Amendment activities. Section 11(a)(1) provides that the Health Department *shall* revoke a license or permit if the Health Department discovers that false or misleading information or data was given on any application or that material facts were omitted from any application. In light of the fact that, as discussed above, the disclosures required by Sections 4 and 6 of the ordinance are overbroad and require the disclosure of information which is not reasonably related to the determination of whether a license or permit should be issued, to the extent that Section 11(a)(1) would require the revocation of a license or permit for the failure to disclose such information, Section 11(a)(1) is also overbroad.

 Section 11(a)(2) provides that the Health Department *shall* revoke a license or permit if:

[t]he operator or entertainer, or any employee of the operator, violates any provision of this ordinance or any rule or regulation adopted by the Board of Health pursuant to the ordinance; provided, however, that in the case of a first offense by an operator where the conduct was solely that of an employee, the penalty shall not exceed a suspension of thirty (30) days if the Board shall find that the operator had no actual or constructive knowledge of such violation and could not by the exercise of due diligence have such actual or constructive knowledge.

Section 14(a) requires that an operator maintain a register of all employees, showing the name and address used by employees, their home address, age, birthdate, sex, height, weight, color of hair and eyes, phone number, social security number, date of employment and termination, duties of each employee and such other information

as may be required by the Board of Health. This information is required to be maintained for three (3) years following the termination of employment. The plaintiffs contend that Section 11(a)(2) is unconstitutional to the extent that it requires the revocation of a license if the operator fails to comply with Section 14(a). The plaintiffs argue that the requirements of Section 14(a) have no reasonable relationship to the purpose of the ordinance. Mr. Eadie testified, however, that the register was necessary in order for the Health Department to trace any contacts that were made with employees. Accordingly, the Court finds that there is reasonable relationship between Section 14(a) and the stated purpose of the ordinance. However, as discussed above, the definition of employee set forth in Section 2 is overbroad. Accordingly, to the extent that this provision relies on that definition, it, too, is overbroad.

The plaintiffs also contend that Section 11(d), which in part provides that any operator, entertainer or employee whose license is revoked shall not be eligible to receive a license or permit for five (5) years from the date of revocation, is unconstitutional because the government has not made a showing of the justification for such a restraint. Mr. Eadie testified that this provision of Section 11(d) was adopted because it was included in a Chattanooga ordinance which had withstood a constitutional challenge and it seemed reasonable to the various government attorneys. (Trial Transcript, Docket No. 63, Col. II, p. 10). Clearly, Mr. Eadie failed to articulate a legitimate reason for this provision. However, the Court believes that there is an overwhelming justification for such a restraint. The spread of sexually-transmitted diseases, particularly AIDS, is a recognized threat in this community and the United States as a whole. Accordingly, when an operator, entertainer, or employee engages in conduct which promotes the spread of such diseases, the Court finds that it is substantially related to the legitimate purpose of the ordinance, and it is entirely justifiable to require such person to forego a license or permit for five years.

This provision acts first as a deterrent and therefore works to prevent the conduct which could lead to the transmission of AIDS and other sexually-transmitted diseases. Second, this provision acts to prevent the recurrence of conduct after it has been discovered.

The plaintiffs also contend that Section 11(d) which further provides that no location or premises where a license has been revoked within the past two years shall be issued a new license is also unconstitutional because it bears no reasonable relationship to a legitimate and substantial government interest. Again, Mr. Eadie testified that this provision of Section 11(d) was adopted because it was included in the Chattanooga ordinance which had withstood a constitutional challenge and it seemed reasonable to the various government attorneys. (Trial Transcript, Docket No. 63, Vol. II, p. 12). Again, Mr. Eadie has failed to articulate a legitimate reason for this provision. The Court finds that this provision bears no rational relationship to the stated purpose of the ordinance to insure that the spread of sexually-transmitted diseases is prevented. If a license or permit is revoked so that individuals culpable of conduct which is conducive to the spread of sexually-transmitted disease in violation of the ordinance are no longer conducting business, there is no valid purpose for restraining the use of the property by a different applicant.

The plaintiffs also contend that Section 12 which provides for the suspension of a license in case of a threat to public health or safety is unconstitutionally vague because it does not contain sufficient guidelines setting forth what constitutes a threat to public health and safety. The Court disagrees. The provisions of Section 12 incorporate powers already granted to the Health Department, the Codes Administration and the Fire Marshal with respect to any establishment open to the public in Nashville. (Trial Transcript, Vol. II, pp. 13–17, 158, Vol. III, p. 51). Moreover, each of these departments is governed by a code which sets forth the standards for determining whether an establishment is in com-

pliance with the health and safety requirements of Metro. In addition, Section 12 contains adequate provisions to protect an owner from an arbitrary determination that his premises constitute a threat to the public health and safety. Section 12(a) provides for the suspension of a license only after an operator is given written notice of a safety violation and is given *at least* ten (10) days to rectify the situation. In addition, an operator is provided with the opportunity to have a hearing on the matter before the Board of Health. Section 12(b) provides for the immediate suspension of a license but only if there exists on the premises an "imminent, serious threat to the public health or safety." In addition, Section 12(b) provides that an operator may request a hearing before the Board of Health and that such a hearing shall be held within ten (10) days of the receipt of the request by the Board of Health.

### G. HOURS OF OPERATION

■ The plaintiffs contend that Section 13(a) of the ordinance which provides that no adult-oriented establishment shall be open between the hours of 3:00 a.m. and 8:00 a.m. on weekdays and Saturdays or between the hours of 3:00 a.m. and 12:00 noon on Sundays bears no rational relationship to the ordinance and constitutes an unlawful prior restraint on the plaintiffs' First Amendment rights. Mr. Eadie testified that this provision bears no reasonable relationship to the purpose of the ordinance. (Trial Transcript, Vol. II, pp. 17–18). However, the ordinance only restricts the operation of adult-oriented establishments to nineteen hours a day, six days a week and fifteen hours a day on the seventh day. Accordingly, the ordinance provides numerous hours each day for the plaintiffs to engage in their First Amendment business. Certainly, the required closure of these adult-oriented establishments for a few hours each day is only a minimum infringement on the plaintiffs' First Amendment rights and is justified by the difficulty of policing and enforcing the ordinance in the wee hours of the morning.

### H. INSPECTIONS

■ The plaintiffs contend that Section 13(b) of the ordinance which provides for unlimited inspections, at reasonable times, by the Health Department, Metro Police Department, Codes Administration, Fire Marshal or other persons as the Health Department constitutes an unreasonable search and seizure, in violation of the Fourth Amendment to the Constitution, because no warrant is required. However, the Fourth Amendment's proscription against unreasonable search and seizure applies only to those portions of the commercial premises not open to the public. The Fourth Amendment does not require a warrant for inspections of those portions of commercial premises which are open to and observable by the public. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821–22, 56 L.Ed.2d 305 (1978). It is that part of the premises which is open to the public and in which members of the public are engaging in acts which promote the spread of sexually-transmitted diseases which is of primary concern in this ordinance. Accordingly, to the extent that these inspections are limited to the part of the premises open to the public, this provision does not violate the Fourth Amendment to the Constitution.

### I. RESPONSIBILITIES OF THE OPERATOR

■ The plaintiffs contend that Sections 14(c) and (d) of the ordinance which make a licensee responsible for the conduct and/or actions of his employees while they are on the licensed premises are unconstitutionally overbroad. The Court disagrees. The law imposes vicarious liability in a host of circumstances, and there is no reason why vicarious liability is inappropriate in these circumstances. Moreover, this very issue has been addressed in *Broadway Books v. Roberts, supra*. In *Broadway Books*, the District Court for the Eastern District of Tennessee held that the exact language of Sections 14(c) and (d) of the ordinance do not penalize a licensee for activities over which the licensee has no control and therefore is constitutional under the *O'Brien* test.

The plaintiffs further contend that Section 14(e) of the ordinance which provides that there shall be conspiciously posted a list of any and all entertainment provided in the premises together with the fee or charge for the type of entertainment listed is not reasonably related to any significant state interest. Mr. Eadie conceded that there was no rational relationship between this provision and the stated purpose of the ordinance. (Trial Transcript, Vol. II, p. 31) and the Court can find no relationship between this provision and the spread of sexually-transmitted diseases. Accordingly, the Court finds that this provision constitutes an unlawful prior restraint on the plaintiffs' First Amendment rights.

The plaintiffs also challenge Section 4(g) of the ordinance with provides:

Every adult-oriented establishment shall be physically arranged and illuminated in such a manner that the entire interior portion of the booths, cubicles, rooms, or stalls, wherein adult entertainment is provided, shall be visible from the common area of the premises. Visibility shall not be blocked or obscured by doors, curtains, partitions, drapes or any other obstruction whatsoever. It shall be unlawful to install booths, cubicles, rooms or stalls within adult-oriented establishments, for whatever purpose, but especially for the purpose of the secluded viewing of adult-oriented motion pictures or other types of adult entertainment.

The plaintiffs first contend that Section 14(g) of the ordinance is preempted by Tenn.Code Ann. § 39–6–1114 which provides:

X–Rated Films—Restrictions on showing—It shall be unlawful for any person, firm, corporation or partnership to exhibit for public consumption whether or not such exhibition is for compensation, any motion picture, film, movie or videotape which is rated "X" by a recognized movie rating authority or which depicts sexual conduct as defined in § 39–6–1101 unless such exhibition is within a theatre auditorium or other enclosed area which effectively removes such exhibition from the view of members of the public who are

not voluntarily engaged in viewing such motion picture, film, movie or videotape.

The plaintiffs contend that these statutes are directly inapposite to each other and that the state statute must prevail while the Metro ordinance must fall. However, it is the duty of the Court in construing a statute to avoid a construction whieh will place one statute in conflict with another and the Court should resolve any possible conflict between statutes in favor of each other, wherever possible, so as to provide harmonious operation of laws. *Parkridge Hospital Inc. v. Woods*, 561 S.W.2d 754 (Tenn.1978). In this case, the Court does not believe that there is an irreconcilable conflict between the state statute and the Metro ordinance. The purpose of the state statute is clearly to prevent the showing of X-rated materials in places where the general public might be exposed to such materials. This is not a concern in an adult-oriented establishment. Persons who enter an adult-oriented establishment can hardly expect not to be exposed to sexually-explicit material. Accordingly, persons who enter such an establishment voluntarily expose themselves to whatever explicit material is there, whether it be a live performance, a videotape or magazines. Therefore, an ordinance requiring that the booth in which live entertainment or films are shown to be visible from the public areas of the adult-oriented establishment does not make such exhibition available to members of the public who are not voluntarily exposing themselves to such a showing and is not inapposite to the state statute.

The plaintiffs also contend that Section 14(g) of the ordinance is vague and overbroad. The plaintiffs first contend that the term "common area" is vague. The Court disagrees. The term "common area" has a well-understood use and meaning in the English language, and the Court finds that the term is sufficient to put licensees on notice of their duties and obligations. Second, the plaintiffs contend that the provision is vague and overbroad because the third sentence bans the installation of stalls, booths, rooms and cubicles for whatever purpose which therefore bans the installation of a restroom, a closet, or

an office. Mr. Eadie conceded that the literal language of the clause would even prevent the installation of stalls in a public bathroom. (Trial Transcript, Vol. II, p. 35). There is no question that such a broad ban bears no relationship to the stated purpose of the ordinance and is unconstitutionally vague and overbroad. However, the remainder of Section 14(g) which requires that "any booths, cubicles, rooms or stalls, wherein adult entertainment is provided, shall be visible from the common area of the premises" is clearly constitutional.[6] The same language was upheld by the District Court for the Eastern District of Tennessee in *Broadway Books, supra,* and similar open booth requirements have recently been upheld by the Fourth Circuit in *Wall Distributors v. City of Newport News, Va.,* 782 F.2d 1165 (4th Cir.1986); the Ninth Circuit in *Ellwest Stereo Theatres, Inc. v. Wenner,* 681 F.2d 1243 (9th Cir.1982) and by the Supreme Court of Kansas in *Moody v. Board of County Commissioners,* 237 Kan. 67, 697 P.2d 1310 (1985). *See also Berg, supra; Doe v. City of Minneapolis, supra.*

▮ The plaintiffs also contend that the ordinance is overbroad because it requires that any area used for the purpose of viewing adult entertainment be accessible and illuminated. Section 14(h). The plaintiffs contend that the requirement that the areas be illuminated would make the showing of a film or motion picture impossible. However, Mr. Eadie testified that the illumination need only be sufficient that the area can be seen to insure that no activity is occurring in violation of the ordinance. Such minimal illumination is hardly enough to prevent the showing of a film or motion picture.

▮ The plaintiffs also challenge the validity of Section 15(a) of the ordinance which provides that "no operator, entertainer, or employee of an adult-oriented establishment shall permit to be performed, offer to perform, perform, or allow patrons to perform sexual intercourse or oral or anal copulation or other contact stimulation of the genitalia." This provision is clearly and necessarily related to the stated purpose of the ordinance. In addition, like Sections 14(c) and (d), it does not penalize a licensee for activities over which the licensee has no control and, therefore, it is constitutional under the *O'Brien* test. See *Broadway Books, supra.*

## J. NUDE ENTERTAINMENT

Section 15(c) of the ordinance provides that

no operator, entertainer, employee or customer shall be unclothed or in such attire, costume or clothing so as to expose to view any specified anatomical areas as defined in Section 2(m) of the ordinance, of said operator, entertainer, or employee with the intent to arouse or gratify the sexual desires of the operator, entertainer, employee or customer.

Section 2(m) defines "specified anatomical areas" as (1) less than completely or opaquely covered, (i) human genitals, pubic region, (ii) buttocks; (iii) female breasts below a point immediately above the top of the areola; and (2) human male genitals in a discernably turgid state even if completely opaquely covered. According to Mr. Eadie, the literal language of this provision prohibits any live, nude performances. (Trial Transcript, Vol. II, pp. 39–40). How-

---

**6.** The plaintiffs also contend that this section of the ordinance does not apply the least restrictive means of accomplishing its goal of the prevention of sexually-transmitted disease. The plaintiffs contend that the concern of the City to insure that the booths are not being used for the performance of sexual activity or engaging in self-gratification could be accomplished by requiring the removal of the bottom two or three feet of the door while still preserving the privacy of the customer. Again, the Court disagrees. First, as the Court for the Eastern District determined in *Broadway Books, supra,* the plaintiffs

have no right to privacy to watch sexually-explicit videos in seclusion. Second, the removal of the bottom two or three feet of the doors in the booths could still permit the performance of sexual activity or self-gratification although the logistics of engaging in such acts might require more ingenuity than if there were a complete door on the booth. The Court finds that the open booth requirement of the ordinance is a restriction no greater than that essential to the furtherance of the state interest and clearly meets the *O'Brien* test.

ever, the Supreme Court has held that nude dancing is presumptively protected under the First Amendment to the United States. *Schad, supra; Doran, supra.* In *Schad,* the Supreme Court stated:

> Nor may an entertainment program be prohibited solely because it displays the nude human figure. 'Nudity alone' does not place otherwise protected material outside the mantle of the First Amendment.

Therefore, only regulations which meet the requirements of the *O'Brien* test may be imposed on nude dancing. In this case, there is only a tentative connection between the nude dancing and the government purpose of prevention of sexually-transmitted disease. It is the sexual acts, not the nude performances, which must be prevented in these establishments to prevent the spread of sexually-transmitted disease. In fact, Metro implicitly recognizes this in its Amendment which exempts adult caberets from the requirements of the ordinance. As Dr. Bistowish testified, he felt the Amendment was permissible because there is little risk of physical contact in the open setting of these caberets. (Trial Transcript, Vol. II, pp. 184–85). In this case, the ordinance contains provisions designed to insure that the watching of the adult-oriented entertainment occurs in open areas. Accordingly, the ban on the presumptively protected expression of nude dancing is not the least restrictive means of accomplishing the stated purpose of the ordinance and, therefore, constitutes an unconstitutional prior restraint in violation of the First and Fourteenth Amendment to the Constitution.

### K. THE REVIEW PROCEDURES

The plaintiffs also contend that the review procedures for the denial of a license or a permit as set forth in Sections 4(c)(d) and (e) and 6(c)(d)(e) of the ordinance and the review procedure for the revocation or suspension of a license as set forth in Sections 11(b), 12(e) and 12(b) of the ordinance do not meet the minimum standards necessary to protect against improper infringement of the plaintiffs' First Amendment.

The essence of procedural due process of law under the Fourteenth Amendment is that a person be afforded reasonable notice and a hearing in a timely fashion when threatened with loss of liberty or a property interest. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The requirement of procedural due process of law is fully satisfied when a person has a right to a hearing before an administrative body and a right to Court review before deprivation of a property or liberty interest. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In the context of the First Amendment, the Supreme Court has held that in order to satisfy the requirements of procedural due process, a prompt judicial hearing must be held before imposing a final restraint on protected speech. *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Under the review procedures of this ordinance, a person aggrieved by the Health Department's decision is entitled to a hearing before the Board of Health. However, nothing in the ordinance provides which party bears the burden of proof or what the standards are of proof or review. In addition, Mr. Eadie testified that hearings before the Board of Health have no formal standards and do not follow any formal procedure. (Trial Transcript, Vol. II, p. 168). In addition, there is no requirement that a prompt disposition be made of the aggrieved party's complaint. Nor does the ordinance provide any opportunity for judicial review prior to the revocation or suspension of a license. Accordingly, a license or permit holder who has had his or her license suspended or revoked must forgo the exercise of his or her First Amendment rights until such time as a decision on appeal can be made. Accordingly, the review procedures set forth in the ordinance do not meet the minimum procedural due process requirements of *Mathews* or *Freedman.*

### L. MISCELLANEOUS PROVISIONS

The plaintiffs also challenge the following sections of the ordinance which

they contend are vague and overbroad: Sections 2(b), 2(c), 2(d), 2(h), 4(b), 4(b)(10) and 4(b)(12). Most of these provisions have been discussed previously in this memorandum and do not need to be addressed again. However, Section 2(b) has not yet been addressed. Section 2(b) defines the term "adult bookstore" as follows:

'Adult Bookstore' means an establishment having as a substantial or significant portion of its stock and trade in books, films, video cassettes, or magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to 'specified sexual activities' or 'specified anatomical areas' as defined below and, in conjunction therewith have facilities for the presentation of adult entertainment as defined below, and including adult-oriented films, movies, or live entertainment, for observation by patrons therein.

The plaintiffs contend that the phrase "substantial or significant" is vague and overbroad and does not put the owner of a bookstore which sells such adult-oriented material on notice of whether it is an "adult bookstore" as defined by the ordinance. Mr. Eadie, the person designated by the Health Department as the person who would have knowledge of the Health Department's operation, management and enforcement of the ordinance, first testified that "substantial or significant" meant that greater than half of what a bookstore offers for sale must be adult-oriented material. (Trial Transcript, Vol. I, pp. 56–62). He then changed his testimony, stating that he could not quantify the term "significant or substantial" and stated that the ordinance would cover bookstores which sold less than 50 percent adult-oriented materials. (Trial Transcript, Vol. I, pp. 62–74). Finally, Mr. Eadie testified that the real concern of the Health Department was not with what percentage of the material sold at the bookstores was adult-oriented but was with the activities which occurred in these bookstores and that the ordinance sought to regulate the adult bookstores in which there were enclosed booths in which sexual activities occur. (Trial Transcript,

Vol. I, pp. 66–74). The Court finds it extremely revealing that a representative of the Health Department, the agency charged with administering this ordinance, was unable to determine under the ordinance which establishments it was entitled to regulate. Clearly, if the regulating authority cannot determine the establishments which are subject to its authority, the establishments themselves cannot be expected to determine whether they need to be licensed or not.

## V.

As set forth above, the Court finds that numerous provisions of ordinance No. 086–1549 are facially invalid under the test set forth in *United States v. O'Brien, supra,* and violate the First and Fourteenth Amendment to the United States Constitution. Section 18 of the ordinance provides for such an eventuality and states:

Should any court of competent jurisdiction declare any section, clause, or provision of this ordinance to be unconstitutional, such decision shall affect only such section, clause or provision so declared unconstitutional, and shall not affect any other section, clause, or provision of this ordinance.

The Court is aware that the Supreme Court has held that a statute is presumed divisible, where the legislature provides that the invalidity of any section shall not affect the validity of others. *Williams v. Standard Oil Co. of Louisiana,* 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287 (1929). Accordingly, if possible, it is the duty of the courts to give effect to a severability clause and to make an elision so as not to invalidate an entire act. *Moore v. Fowinkle,* 512 F.2d 629 (6th Cir.1975). However, in this case, the remaining provisions of the ordinance would be essentially meaningless after the unconstitutional provisions of the ordinance are severed. In addition, the remaining provisions would not be fully operative as a law. Therefore, the Court declares that ordinance No. 086–1549 is unenforceable in its entirety. Accordingly, an injunction will issue against the defendants, and the de-

fendants are enjoined from enforcing ordinance No. 086–1549 in its entirety.

## VI.

The plaintiff, Ellwest Stereo Theatre, seeks damages in the amount of $69,233.50 through December 31, 1988, plus $129.70 per day through the date of entry of the order accompanying this memorandum. The plaintiff, First Amendment Books, seeks damages in the amount of $81,907.02 through December 31, 1988, plus $68.47 per day through the date of entry of the order accompanying this memorandum. The plaintiffs contend that these damages represent the difference in income between the income generated by the booths when the booths were enclosed and the income generated by the booths since the ordinance has been enforced and the doors to the booths have been removed.[7]

Accordingly, the only damages which the plaintiffs seek are damages with respect to Section 14(g) of the ordinance which requires that the booths be open to view from the common areas of these establishments. As discussed above, Section 14(g) of the ordinance is constitutional to the extent that it requires the doors on the booths to be removed. Therefore, the plaintiffs did not suffer any damages with respect to the unconstitutional provisions of the ordinance which have not been enforced to date. Accordingly, the claims for damages will be denied.

An appropriate order will be entered.

---

7. The only provision of the ordinance which has been enforced is the requirement that the doors on the booths be removed. As discussed above, Metro did not enforce the remainder of the ordinance, pending the outcome of this action.